[Civ. No. 42125. First Dist., Div. Three. Apr. 20, 1978.]

J. D., Plaintiff and Appellant, v.
JEROME A. LACKNER, as Director, etc., Defendant and Respondent.

COUNSEL

Carl L. McConnell and Peter H. Reid for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, Asher Rubin and John Davidson, Deputy Attorneys General, for Defendant and Respondent.

OPINION

ABBE, J.*—The essential facts in this case are not in dispute.

Appellant, who has been and shall be allowed to proceed herein under the fictitious name J. D. was born physically a male on January 1, 1948. At a very early age, she developed many female characteristics which became more obvious as she grew older. The evidence presented at the hearing was that appellant has never experienced an erection or had sexual relations and has failed to develop secondary male sex characteristics, such as facial hair and a deepening of the voice. Her mother and father were unable to accept this. Appellant's childhood was unstable and she developed a drinking problem in late adolescence. As a result of family problems, appellant moved to San Francisco at age 20, adopted a female name and started living completely as a woman. She obtained employment at various places but was unable to continue in these jobs more than a month or so and then she would be fired or would quit due to her failure to undergo physical examinations because of her fear of having her genital identity discovered. She has suffered severe depression and has attempted suicide on several occasions.

In 1969, appellant sought assistance from Dr. J. Leibman at the Center for Special Problems. He began hormone therapy and eventually referred her to the Stanford University Gender Dysphoria Program, where she has been receiving treatment for the past three or four years.

Dr. Donald Laub, Codirector of the Stanford Program in a letter dated September 14, 1976, states that: "[J. D.] has undergone extensive evaluation by the Stanford University Gender Dysphoria Program. It is our finding that [J. D.] suffers from severe gender dysphoria and that she will never make an adequate adjustment to life in the male role. Because

---

*Assigned by the Chairperson of the Judicial Council.

of [J. D.'s] diagnosis, her long term commitment to living exclusively as a woman (approximately 10 years of cross-living supplemented by exogenous female hormones, estrogens), and her remarkable efforts at self-rehabilitation, we have approved [J. D.] for sex reassignment surgery. [¶] We have prescribed this treatment, sex reassignment surgery, for [J. D.] in the knowledge that surgery is the *only* medically recognized therapy for this disorder, gender dysphoria syndrome, and the standard care provided for carefully screened patients at over twenty centers in the United States. The surgical technique employed is not experimental but has been refined to produce predictably good results both in terms of the anatomic accuracy of the corrected genitalia and in terms of the successful 'cure' afforded by this operation. Postoperative follow-up at several other centers has been consistent with these conclusions which are based on our treatment of approximately 200 patients. [¶] Many attempts have been made to determine the etiology of this disorder. Results of completed studies are inconclusive in terms of identifying a single causative factor; however, existent data strongly suggest that the disease is not simply psychological in nature but that there is an organic component to the disease in the form of prenatal hormonal effects on the developing hypothalamus."

Dr. Norman Fisk, a psychiatrist at the Stanford Medical Center, has also been treating the appellant for the past three years for severe depression caused by her frustration over her gender identity. During the course of the hearing, Dr. Fisk testified that he has treated the appellant on an in-patient basis on at least five occasions, some of which involved suicide attempts. Dr. Fisk further testified that there are no other known cures for the appellant's condition through psychotherapy and that the surgery is needed not only from a diagnostic standpoint but may even be life saving from the standpoint of the appellant's suicide attempts.

On May 6, 1976, Dr. Laub filed a treatment authorization request with Medi-Cal for a surgical procedure described as: neocolporrhaphy with split thickness skin graft or surgical removal of the male genitalia and construction of female genitalia. The request was denied by Dr. Wayne Erdbrink, a Medi-Cal consultant whose specialty is ophthalmology.

No examination of any kind has ever been performed on J. D. by anyone in the Department of Health.

J. D. requested a hearing pursuant to Welfare and Institutions Code section 10950. The hearing was held on September 15, 1976, before

Thomas Wilcock, a referee for the California Department of Health, who ordered the treatment authorization request be granted.

The order of the referee was reversed by the Director of the Department of Health (hereinafter referred to as the Director), who ruled that the request for the operation would be denied since "The proposed surgery is a description of a cosmetic operation which would change the appearance of the claimant's external genitalia. Although the evidence indicates that the proposed operation may have psychological benefits for the claimant, the evidence establishes that the cosmetic operation is not medically necessary for the prevention, diagnosis or treatment of disease, illness, or injury. The cosmetic operation is proposed in order to change the external appearance of the claimant's genitalia so that the appearance of the claimant's body would be in congruence with the claimant's psychological makeup."

At the hearing before the referee, appellant testified as did Dr. Fisk and she also presented evidence by Dr. Laub, Dr. David Feldman, an endocrinologist, who examined appellant on a referral from Dr. Fisk and Mr. Donald Piercy, a rehabilitation counselor.

Dr. Erdbrink, the ophthalmologist, appeared on behalf of the Department of Health and presented two Medi-Cal bulletins, one dated July 1976, and one September 1974. There was no other evidence presented on behalf of the Department of Health. The September 1974 bulletin contained the following: "All medical services directly related to the diagnostic workup, surgical procedure, hormonal therapy or psychiatric care involved in transsexual surgery are not payable under the Medi-Cal Program. Medi-Cal will, however, cover the *medical complications* of such medical care to the extent the complications are typical of those encountered in the general population, such as a recto-vaginal fistula following such trans-sexual surgery. Claims submitted for treatment of such complications must contain sufficient documentation to justify the medical need."

The only evidence in this case, as in the companion case we are deciding today entitled *G. B.* v. *Lackner, ante,* page 64 [145 Cal.Rptr. 555] which we refer to for a discussion of the illness, transsexualism, establishes that the condition J. D. has is an illness, albeit relatively rare, in which the only known treatment is radical sex conversion surgery.

Medi-Cal is part of the Medical Assistance Program (Medicaid) established by title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq. in order to provide necessary medical care to poor people and to ensure them access to the same quality and level of service available to private patients. J. D. is a poor person.

The evidence presented in these proceedings establishes that J. D. has an illness and that as far as her illness affects her, the proposed surgery is medically reasonable and necessary and that there is no other effective treatment method. There has been no evidence to the contrary presented in this case nor in the companion case, *G. B.* v. *Lackner, supra, ante,* and we believe we are required to rule on these two cases on the evidence, not on the basis of a whimsical decision of the Director, Dr. Lackner.

As stated in *G. B.* v. *Lackner, supra, ante*: We do not believe, by the wildest stretch of the imagination, that such surgery can reasonably and logically be characterized as cosmetic.

The judgment denying the writ is reversed and the case is remanded to the trial court with instructions to issue a writ of mandate directing respondent to grant the treatment authorization request for appellant's surgery.

Feinberg, J., concurred.


**SCOTT, Acting P. J.**—I dissent, for the reasons set out in my dissenting opinion in *G. B.* v. *Lackner, ante,* page 64 [145 Cal.Rptr. 555]. The case at bench, like *G. B.* v. *Lackner,* involves a person who is physically a normal male, but who feels that he is a woman. Although appellant does not have a deep voice or facial hair, and appellant testified that he had never experienced an erection or had sexual relations with a woman, substantial evidence was presented that appellant is, physically, a normal male. Appellant presented a letter dated September 10, 1976, at his fair hearing, in which Dr. David Feldman, assistant professor of medicine at Stanford University, stated that appellant's "genitals appear to be that of a normal male with questionably slight testicular atrophy. Our impression was that the patient was a genetic male and that there was no endocrinologic abnormality present." After making several hormone measurements, Dr. Feldman concluded, "At this point there does not seem to be an endocrinologic abnormality except for the elevated

estrogen which I feel is most likely due to ingestion of estrogen." Consequently, I would uphold the decision of Dr. Lackner to refuse Medi-Cal benefits for an operation meant to remove appellant's normal genitals and to create artificial female genitals by plastic surgery, which will conform appellant's appearance to his conception of himself.

The majority states that no evidence was produced in *G. B.* v. *Lackner* or in the instant case, except that the surgery is medically reasonable and necessary. The majority concludes that it is bound to rule on these two cases on the basis of that evidence. However, the determination whether the proposed surgery is medically reasonable and necessary is not itself an evidentiary fact; rather, it is a conclusion drawn from the facts. The details of appellant's physical and mental condition, and of the operation proposed as "treatment," constitute the relevant evidentiary facts. The issue here is not whether appellant is a true transsexual, but whether the state must finance transsexual surgery for a physically normal male. Dr. Lackner, as a medical doctor and in his capacity as Director of the Department of Health, has determined that transsexual surgery is not a medically necessary treatment for a person with appellant's symptoms. The Director of the Department of Health is charged by statute with making policy for the administration of the Medi-Cal program. (Welf. & Inst. Code, § 14105.) The majority's characterization of Dr. Lackner's determination as "whimsical" is at best most unfortunate and inaccurate. Dr. Lackner was given a statutory duty which he discharged. The majority usurps the Director's role.

Under the majority's analysis, the Department of Health will be compelled to hire an expert witness to appear and testify at every hearing where the department seeks to deny benefits to the applicant. Otherwise, as was done in the instant case, the applicant will be able to contend that no substantial evidence supports the denial of his claim. If the substantial evidence test is applied only to evidentiary facts, and not to conclusions drawn therefrom, this needless expenditure of public funds can be avoided.

Under the applicable law as set forth in my dissent in *G. B.* v. *Lackner,* sufficient evidence of appellant's condition and the proposed treatment was presented at appellant's fair hearing to support the Director's decision. I would affirm the judgment.

A petition for a rehearing was denied May 19, 1978. Scott, J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied June 29, 1978. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.