[Civ. No. 41363. First Dist., Div. Three. Apr. 20, 1978.]

G. B., Plaintiff and Appellant, v.
JEROME A. LACKNER, as Director, etc., Defendant and Respondent.

**COUNSEL**

Paul R. Perdue, Patricia D. Lee and David C. Moon for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, Asher Rubin, and John Davidson, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

ABBE, J.*—In 1975, the appellant, hereinafter referred to as G. B., consulted Dr. John Brown, a plastic surgeon, who diagnosed him as suffering from gender identity dysphoria or transsexualism. Dr. Brown determined that it was medically necessary and reasonable to perform surgery, which would involve the removal of the male sex organs and construction of female genitalia.

Dr. Brown filed a treatment authorization request with the San Francisco Medi-Cal field office. The request was denied by Dr. Wayne Erdbrink, a Medi-Cal consultant who is an ophthalmologist. No examination of any kind was ever performed on G. B. by the Department of Health.

G. B. requested a hearing pursuant to Welfare and Institutions Code section 10950 and got it. It was held in San Francisco on October 28, 1975, before Lester Lisker, a referee for the Department of Health, who ordered the treatment authorization request be granted.

The order of the referee was reversed by the Director of the California Department of Health (hereinafter referred to as Director). His refusal to authorize Medi-Cal to pay for the proposed surgery is set forth in a document entitled "Decision of the Director" and was signed by Lee Helsel, Deputy Director. The decision reads, in part, as follows: "The proposed operation as described by the claimant's doctor is a description of a cosmetic operation that would change the appearance of the claimant's external genitalia. Inasmuch as the proposed operation is to be performed solely for that purpose, it must be considered a cosmetic operation that is not covered under the Medi-Cal Program."

At the hearing before the referee, G. B. presented evidence by Dr. W. A. Tennant, a psychologist, Dr. Richard Crews, a psychiatrist, Dr. Jack Leibman, a medical doctor whose specialty is internal medicine and is a consultant to the Stanford University gender dysphoria program and Dr. John Brown, a physician specializing in surgery. Dr. Erdbrink, the ophthalmologist, appeared on behalf of the Department of Health and presented a Medi-Cal bulletin dated September 1974, which contained the following announcement: "All medical services directly related to the diagnostic workup, surgical procedure, hormonal therapy or psychia-

---

*Assigned by the Chairperson of the Judicial Council.

tric care involved in trans-sexual surgery are not payable under the Medi-Cal Program. Medi-Cal will, however, cover the *medical complications* of such medical care to the extent the complications are typical of those encountered in the general population, such as a recto-vaginal fistula following such trans-sexual surgery. Claims submitted for treatment of such complications must contain sufficient documentation to justify the medical need. . . ."

Dr. Leibman asserted that G. B. "must have this [gender change] surgery to alleviate her emotional problems, prevent them from exacerbation, and to rehabilitate her to the point where she can function as a normal person and participate fully in society."

Dr. Brown stated that G. B. "must have the requested surgery to treat her disorder and prevent further suffering, enable her to participate in normal living, and obtain steady employment."

Dr. Tennant concluded a discussion of this type of surgery as follows: "Denial of this valid medical treatment can lead to a further deterioration in the psychological health of the transsexual resulting in self-mutilating acts and in some cases suicide."

Dr. Richard Crews declared that, "As a general rule transsexuals have an improved psychological, social, and vocational adjustment after transsexual surgery. I believe this will prove to be the case for [G. B.]. Numerous attempts by way of therapy, pharmacology, behavioral and disciplinary approaches have generally been unavailing in treating the transsexual. Surgery is thus indicated for [G. B.] and I believe she would benefit significantly by it."

The reversal of the referee's decision by the Director was on the sole ground that the proposed surgery was cosmetic in that it would change the appearance of G. B.'s external genitalia and, therefore, was not covered under the Medi-Cal program. The Director's conclusion that castration and penectomy changes the appearance of male genitalia seems strained.

There is no dispute that G. B. is an adult male transsexual. Adult male transsexuals, such as G. B., are not transvestites nor homosexuals but are males who have irreversibly accepted a gender identification as female. (See generally, Stoller, Sex and Gender (1968); Green & Money, Transsexualism and Sex Reassignment (1969) p. 268.) Medical experts

agree that the etiology of transsexualism is unknown but that it occurs early in life and is a serious problem of gender role disorientation. (Benjamin, *Should Surgery be Performed on Transsexuals?* 25 Am.J. Psychotherapy, pp. 74-75.)

Dr. Leibman, quoted above, describes transsexuals as a ". . . unique group of people who suffer from a profound disorder of sexual gender identity of an unknown cause . . . . This disorder is almost always associated with secondary emotional illnesses such as adjustment reactions, anxiety neuroses or depressive neuroses. [¶] Psychotherapy has been uniformly unsuccessful in alleviating the primary and secondary illnesses described above. The *only* treatment which has been found to be effective is hormonal feminization and eventual sex change surgery. In many cases the described illnesses are cured completely."

Dr. Brown, G. B.'s physician, states that surgery "is reasonable and necessary for the treatment of this mental disorder, an illness which, in the vast majority of cases, only surgery will cure. . . . Failure [to obtain the surgery] will inevitably lead to serious frustration and possible self-mutilation or suicide. Additionally, a preoperative transsexual, in my experience, is often unable to obtain employment due to employer's biases, the requirements of a physical examination prior to employment, or psychological instability resulting from the frustration at being trapped in the body of a person of the opposite sex."

John Hoopes, M.D., of the Gender Identity Clinic at the Johns Hopkins Medical Institute points out: "Over the years, psychiatrists have tried repeatedly to treat these people without surgery, and the conclusion is inescapable that psychotherapy has not so far solved the problem. The patients have no motivation for psychotherapy and do not want to change back to their biological sex. The high incidence of suicide and self-mutilation among these people testifies to the magnitude of the problem. If the mind cannot be changed to fit the body, then perhaps we should consider changing the body to fit the mind." (Green & Money, Transsexualism and Sex Reassignment, *supra,* at p. 268.)

The severity of the problem of transsexualism becomes obvious when one contemplates the reality of the male transsexual's desperate desire to have normally functioning male genitals removed because the male sex organs are a source of immense psychological distress. Transsexuals consider themselves members of the opposite sex cursed with the wrong sexual apparatus.

In *Doe* v. *State, Dept. of Public Welfare* (1977) — Minn. — [257 N.W.2d 816, 819], the Supreme Court of Minnesota, after discussing the nature of transsexualism, found that: "The only medical procedure known to be successful in treating the problem of transsexualism is the radical sex conversion surgical procedure requested" by the appellant in that case.

In *Richards* v. *United States Tennis Ass'n* (1977) 93 Misc. 2d 713 [400 N.Y.S.2d 267, 271], the court states: "Medical Science has not found any organic cause or cure (other than sex reassignment surgery and hormone therapy) for transsexualism, nor has psychotherapy been successful in altering the transsexual's identification with the other sex or his desire for surgical change." (See *Transsexualism, Sex Reassignment Surgery, and the Law* (1970-71) 56 Cornell L.Rev. 963; *Transsexuals in Limbo: The Search for a Legal Definition of Sex* (1971) 31 Md.L.Rev. 236.)

The extent of Medi-Cal coverage is set forth in Welfare and Institutions Code section 14059 as follows: "Health care provided under this chapter may include diagnostic, preventive, corrective, and curative services and supplies essential thereto, provided by qualified medical and related personnel for conditions that cause suffering, endanger life, result in illness or infirmity, interfere with capacity for normal activity including employment, or for conditions which may develop into some significant handicap. [¶] Medical care shall include, but is not limited to, other remedial care, not necessarily medical. Other remedial care shall include, without being limited to, treatment by prayer or healing by spiritual means in the practice of the religion of any church or religious denomination."

Welfare and Institutions Code section 14105 states in part: "The director shall prescribe the policies to be followed in the administration of this chapter . . . and shall adopt such rules and regulations as are necessary for carrying out, not inconsistent with, the provisions thereof."

Pursuant to this authority, the Director promulgated title 22, California Administrative Code, section 51305, subdivision (g), which reads: "Procedures for the treatment of defects for cosmetic purposes only are covered subject to prior authorization. Authorization for procedures primarily for purposes of correcting cosmetic defects may be granted only to: [¶] (1) Complete the repair of serious disfigurement resulting from disease or trauma. [¶] (2) Correct disfiguring defects which substantially interfere with opportunities for employment. These cases

shall be referred to the California Department of Rehabilitation for consultation, evaluation or case management as provided in Section 51014. [¶] (3) Provide necessary services to patients eligible for coverage by Crippled Children Services. These patients shall be referred to Crippled Children Services for case management as provided in Section 51013."

Title 22, California Administrative Code, section 51301 provides that benefits covered by Medi-Cal are limited to those set forth in article Four. Section 51303 authorizes health care services which are reasonable and necessary for the prevention, diagnosis and treatment of disease, illness or injury and are covered by the Medi-Cal program to the extent specified.

Counsel for respondent has indicated that the Director relies solely on the statutes and duly promulgated regulations set forth in title 22 of the California Administrative Code, not on the statement of policy contained in the bulletin presented at the administrative hearing.

The Department of Health has adopted a definition of cosmetic surgery which was approved by the California Medical Association. It defines cosmetic surgery as, "Surgery to alter the texture or configuration of the skin and its relationship with contiguous structures of any feature of the human body. [¶] This alteration would be considered by the average prudent observer to be within the range of normal and acceptable appearance for the patient's age and ethnic background and by competent medical opinion to be without risk to the patient's physical or mental health. [¶] It means only surgery which is sought by the patient for personal reasons and is not used to denote surgery which is needed to correct or improve physical features which may be functionally normal but which attracts undue attention or even ridicule by his peers, or which an average person would consider to be conspicuous, objectionable, abnormal or displeasing to others. [¶] Operations performed to correct congenital anomalies, to remove tumors, or restore parts which were removed in treatment of a tumor or repair a deformity or scar resulting from injury, infection, or other disease process is obviously not cosmetic even though the appearance may be improved by the procedure."

Surely, castration and penectomy cannot be considered surgical procedures to alter the texture and configuration of the skin and the skin's relationship with contiguous structures of the body. Male genitals have to be considered more than just skin, one would think.

The definition relied upon by the Director to establish that the surgery must be considered cosmetic requires that the alteration (of the skin) would be considered by the average prudent observer to be within the range of normal and acceptable appearance for the patient's age and ethnic background. The average prudent observer probably has no desire and will not observe what is under the skirts or trousers of either a pre- or postoperative transsexual. It is not a generally recognized characteristic of transsexuals to move about in public in the nude. Dr. Hoopes, previously quoted, states at page 268: "You would probably never recognize a transsexual as such if you met him casually, or even if you knew him well. I cannot state too emphatically how completely these people assume the role of the opposite sex. The male transsexual looks, dresses, and acts exactly like a woman, and the same is true for his female counterpart. They are not simply transvestites, people who receive pleasure from just wearing the clothes of the opposite sex; nor are they homosexuals, as commonly defined."

■ It is clearly impossible to conclude that transsexual surgery is cosmetic surgery, even using the definition relied on by the Director. Drs. Leibman and Brown and Webster's dictionary define cosmetic as "beautifying, pertaining to or making for beauty," that which tends "to beautify or enhance the appearance of a person."

The only evidence presented in this case was that the surgery was necessary and reasonable.

We conclude that the proposed surgery cannot be arbitrarily classified as cosmetic and inasmuch as this was the sole basis of the Director's decision, his decision must be set aside.

The judgment denying the writ is reversed and the case is remanded to the trial court with instructions to issue a writ of mandate directing respondent to grant the treatment authorization request for appellant's surgery.

Feinberg, J., concurred.

SCOTT, Acting P. J.—I dissent. I would hold that respondent, Dr. Jerome Lackner, the Director of the Department of Health (Director), acted within his discretion in refusing to extend the benefits of the

Medi-Cal program to authorize payment for appellant's transsexual surgery.[1]

The majority today embarks upon a dangerous course of judicial intermeddling with the policy decisions of the Department of Health. If this operation *must* be funded, Medi-Cal will be forced to authorize other surgical treatments as "cures" for neuroses. The Legislature has vested the Director with adequate discretion to determine the parameters of the Medi-Cal program. If the Legislature wishes the State of California to pay for transsexual operations, it may so provide. That is not a matter in which this court should become involved.

## I. CALIFORNIA STATUTORY LAW

Medi-Cal is California's state plan for participation in the federal Medicaid program. (42 U.S.C. § 1396 et seq.) The details of this plan are embodied in the Medi-Cal Act. (Welf. & Inst. Code, § 14000 et seq.) The Director is charged with the duty of making policy. (Welf. & Inst. Code, § 14105; *California Assn. of Nursing Homes etc., Inc.* v. *Williams* (1970) 4 Cal.App.3d 800, 806 [84 Cal.Rptr. 590, 85 Cal.Rptr. 735].) Program benefits are listed in the "Schedule of Benefits." (Welf. & Inst. Code, § 14132; *Piontkowski* v. *Geduldig* (1974) 39 Cal.App.3d 498, 501 [114 Cal.Rptr. 316].) Section 14132 states that in-patient hospital services, including physicians' services, are subject to utilization controls. One such utilization control permitted by the statute is the requirement that prior authorization be obtained for physicians' services to be performed upon hospital in-patients. (Welf. & Inst. Code, § 14133, subd. (a).)[2] Pursuant to sections 10554.1 and 14124.5 of the Welfare and Institutions Code, respondent has promulgated certain regulations, one of which defines prior authorization as "authorization granted by a designated Medi-Cal Consultant in advance of the rendering of a service, unless otherwise specifically stated, after appropriate medical, dental or other

---

[1]Counsel for appellant have indicated in their brief that appellant has already undergone the requested surgery. The issue which remains is respondent's duty to authorize payment for the surgery.

[2]Section 14133 of Welfare and Institutions Code provides in relevant part:

"Utilization controls that may be applied to the services set forth in Section 14132 which are subject to utilization controls shall be limited to:

"(a) Prior authorization, which is approval by a Department of Health consultant, of a specified service in advance of the rendering of that service based upon a determination of medical necessity. Prior authorization includes authorization for multiple services which are requested and granted on the basis of an extended treatment plan where there is a need for continuity in the treatment of a chronic or extended condition."

review." (Cal. Admin. Code, tit. 22, § 51003, subd. (a).) Medi-Cal consultants are a class of public employees (either physicians, dentists or pharmacists) who work in 12 district offices around the state, passing on applications for prior authorization. (Welf. & Inst. Code, §§ 14103.6, 14119; *California Medical Assn. v. Brian* (1973) 30 Cal.App.3d 637, 644 [106 Cal.Rptr. 555].)

The two regulations most pertinent to the instant case are sections 51305, subdivision (g) and 51303, subdivision (a) of title 22 of the California Administrative Code.[3] Section 51305, subdivision (g) reads:

"(g) Procedures for the treatment of defects for cosmetic purposes only are covered subject to prior authorization. Authorization for procedures primarily for purposes of correcting cosmetic defects may be granted only to:

"(1) Complete the repair of serious disfigurement resulting from disease or trauma.

"(2) Correct disfiguring defects which substantially interfere with opportunities for employment. These cases shall be referred to the California Department of Rehabilitation for consultation, evaluation or case management as provided in Section 51014.

"(3) Provide necessary services to patients eligible for coverage by Crippled Children Services. These patients shall be referred to Crippled Children Services for case management as provided in Section 51013."

Section 51303, subdivision (a) reads: "Health care services . . . which are reasonable and necessary for the prevention, diagnosis or treatment of disease, illness or injury are covered by the Medi-Cal Program to the extent specified."

Appellant applied through Dr. Brown, a plastic surgeon, to have Medi-Cal authorize payment for transsexual surgery. Dr. Erdbrink, the Medi-Cal consultant, refused to grant prior authorization for the surgery. Appellant was granted a fair hearing before a referee. The referee filed a proposed decision with the Director, concluding that the surgery should be authorized. The Director was dissatisfied with this decision, and

---

[3]All references to sections of the California Administrative Code are to title 22.

adopted a decision signed by the deputy director, Lee Helsel. It is this latter decision which is the subject of review here.[4] Since appellant was merely an applicant for Medi-Cal funding of the proposed operation, no vested right was involved. Thus, the scope of appellate review is limited to a determination of whether substantial evidence may be found in the administrative record to support the decision of the Director. (*Harlow* v. *Carleson* (1976) 16 Cal.3d 731, 735 [129 Cal.Rptr. 298, 548 P.2d 698].)

In refusing to authorize payment for appellant's operation, the Director relied upon the regulation refusing payment for cosmetic surgery (Cal. Admin. Code, § 51305, subd. (g)) and the regulation limiting payment for health care services to those which are "reasonable and necessary for the prevention, diagnosis or treatment of disease, illness or injury." (Cal. Admin. Code, § 51303, subd. (a).)[5] Appellant argues that no substantial evidence was presented that a transsexual operation is cosmetic, because all those who testified at appellant's fair hearing agreed that the operation would not be performed merely to beautify appellant. Appellant also argues that the proposed operation, which would remove his testicles and penis and create a cavity in his perineum having the appearance of a woman's vagina, has little in common with standard cosmetic procedures such as hair transplants or nose alterations.[6]

---

[4]Although this appeal is taken from the denial of an application for writ of mandate filed in the superior court, the record of the administrative proceedings is the subject of this court's review. (*Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control* (1970) 2 Cal.3d 85, 104 [84 Cal.Rptr. 113, 465 P.2d 1].)

[5]Appellant contends that the Director also based his decision on the following guideline: "All medical services directly related to the diagnostic workup, surgical procedure, hormonal therapy or psychiatric care involved in trans-sexual surgery are not payable under the Medi-Cal Program. Medi-Cal will, however, cover the *medical complications* of such medical care to the extent the complications are typical of those encountered in the general population, such as a recto-vaginal fistula following such trans-sexual surgery. Claims submitted for treatment of such complications must contain sufficient documentation to justify the medical need."

He complains that this guideline was not promulgated in accordance with the Administrative Procedure Act. But this guideline is merely an announcement of the Director's determination that transsexual surgery is usually not covered by the Medi-Cal program; the Director has never argued that the guideline provides the rationale for denying appellant benefits for the surgery. Although Dr. Erdbrink may have felt compelled to abide by this pronouncement, it has no force of law. The decision of the Director does not mention it. Thus, even though the guideline would be invalid if treated as a regulation, the decision of the Director remains unaffected.

[6]Although transsexual surgery is more drastic than most other cosmetic procedures, the procedure bears some resemblance to an operation to reduce the size of a nose, or to reduce the size of female breasts. In all of these operations an incision is made, parts of the organs are removed, and a new body part is fashioned by plastic surgery.

In determining whether substantial evidence supports the Director's conclusion that the operation is cosmetic, great weight is to be given to the Director's interpretation of his own regulation. (*Carmona* v. *Division of Industrial Safety* (1975) 13 Cal.3d 303, 310 [118 Cal.Rptr. 473, 530 P.2d 161]; *Piontkowski* v. *Geduldig, supra,* 39 Cal.App.3d 498, 501.) The Legislature has delegated to the Director, and not to this court, the responsibility for making policy in the Medi-Cal program. This court should not lightly set aside the Director's determination that a transsexual operation is cosmetic.

No evidence was presented in the record that appellant's genitals were abnormal or unhealthy. In transsexual surgery, as in other kinds of cosmetic surgery, nothing is physically amiss with the function of the portion of the body which is altered. The surgery is performed in an effort to alleviate the patient's emotional distress which is caused by his subjective perception of his body. In the administrative record in the instant case, Dr. Leibman states that appellant must have the surgery to alleviate his "emotional" problems. Dr. Tennant describes transsexualism as "a complicated condition wherein an individual clearly anatomically of one sex, is *uncomfortable in that social and sexual role,* and firmly believes that he or she belongs to the other sex." (Italics added.) Dr. Tennant characterizes the purpose of the operation as putting an end to mental suffering and psychological dysfunction. Dr. Crews defines a transsexual as "an individual who is otherwise psychologically competent but has a firm and substantial *sexual and social role identification* different from the biological anatomy." (Italics added.) Dr. Crews states that surgery would be "advisable" for appellant "from a psychiatric standpoint."

Although appellant's psychological condition is admittedly more serious than the condition of most persons who request plastic surgery, this factor does not justify an appellate court in overruling the Director's determination that the surgery is cosmetic. The very nature of the operation described in the record, coupled with the total lack of evidence that appellant's genitals were diseased, damaged or deformed, provides substantial evidence to support the Director's determination that the operation is cosmetic.

Accepting the Director's conclusion that the plastic surgery requested in the instant case is cosmetic, I would hold that the Director properly denied appellant's claim for authorization, since appellant's emotional condition is not the sort of "serious disfigurement" or "disfiguring

defect" which would justify payment under section 51305, subdivision (g) of the California Administrative Code.

Another ground of the Director's decision, equally sufficient, standing alone, to uphold that decision, is the Director's determination that the proposed surgery is not "reasonable and necessary for the prevention, diagnosis or treatment of disease, illness or injury." As stated above, the Medi-Cal program will only pay for health care services which meet this standard. (Cal. Admin. Code, § 51303, subd. (a).) Again, giving proper consideration to the Director's interpretation of his own regulation, I would hold that substantial evidence supports the Director's conclusion that the proposed surgery does not qualify as a program benefit under section 51303, subdivision (a) of the California Administrative Code.

A quotation from the majority opinion illustrates the problem: " 'If the mind cannot be changed to fit the body, then perhaps we should consider changing the body to fit the mind.' (Green & Money, Transsexualism and Sex Reassignment, p. 268.)" Transsexual surgery is vastly different from other types of surgery. Instead of treating the part of the person which is ill, that is, the mind, a transsexual operation surgically alters a normal, healthy part of the body to conform the appearance of that part, as nearly as is medically possible, to the patient's misperception of himself. If the Director has been charged by statute with making policy for the Medi-Cal program (Welf. & Inst. Code, § 14105), surely then the Director could reasonably conclude that this operation is not "reasonable and necessary for the prevention, diagnosis or treatment of disease, illness or injury," as those terms are used in the regulations of the Department of Health.[7]

Having determined that the Director acted in accordance with state law, I would reach appellant's other contentions: that the Director deprived appellant of rights under the federal Social Security Act and the United States and California Constitutions.[8]

---

[7]Appellant argues that all of the evidence presented at the hearing indicates the operation is medically necessary. I would hold that the Director must examine the evidence presented at the hearing and reach his own conclusion as to medical necessity. He need not accept the conclusion of appellant's physician. (See discussion of *Rush* v. *Parham* (N.D.Ga. 1977) 440 F.Supp. 383, *infra*.)

[8]Appellant also claims that the Director was estopped from denying the benefits, and that the Director did not act within 30 days of receipt of the referee's proposed decision. (Welf. & Inst. Code, § 10959.) These contentions are frivolous, since appellant introduced no evidence to show an estoppel or to show the date the Director received the referee's proposed decision.

## II. Federal Statutory Law

Appellant cites two recently decided cases from foreign jurisdictions, *Doe* v. *State, Dept. of Public Welfare* (1977) — Minn. — [257 N.W.2d 816] and *Rush* v. *Parham* (N.D.Ga. 1977) 440 F.Supp. 383. These cases raise the issue of the validity under title XIX of the Social Security Act (hereinafter the Medicaid Act) of a state's refusal to include transsexual surgery as a benefit under the state medical assistance plan. The United States Supreme Court has ruled that, under the Medicaid Act, states which choose to participate in the Medicaid program are required "to provide qualified individuals with financial assistance in five general categories of medical treatment.[9] 42 U.S.C. §§ 1396a(a)(13)(B) (1970 ed., Supp. V), 1396d(a)(1)-(5)." (*Beal* v. *Doe* (1977) 432 U.S. 438, 440-441 [53 L.Ed.2d 464, 469, 97 S.Ct. 2366, 2369].)

The court further held that "nothing in the statute suggests that participating States are required to fund every medical procedure that falls within the delineated categories of medical care. Indeed, the statute expressly provides: 'A State plan for medical assistance must . . . include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan which . . . are consistent with the objectives of this [Title] . . . .' 42 U.S.C. § 1396a(a)(17) (1970 ed., Supp. V). This language confers broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring

[9]In a footnote at this point, the *Beal* court states:

"The general categories of medical treatment enumerated are:

" '(1) inpatient hospital services (other than services in an institution for tuberculosis or mental diseases);

" '(2) outpatient hospital services;

" '(3) other laboratory and X-ray services;

" '(4)(A) skilled nursing facility services (other than services in an institution for tuberculosis or mental diseases) for individuals 21 years of age or older (B) effective July 1, 1969, such early and periodic screening and diagnosis of individuals who are eligible under the plan and are under the age of 21 to ascertain their physical or mental defects, and such health care, treatment, and other measures to correct or ameliorate defects and chronic conditions discovered thereby, as may be provided in regulations of the Secretary; and (C) family planning services and supplies furnished (directly or under arrangement with others) to individuals of child-bearing age (including minors who can be considered to be sexually active) who are eligible under the State plan and who desire such services and supplies;

" '(5) physicians' services furnished by a physician (as defined in section 1395x(r)(l) of this title), whether furnished in the office, the patient's home, a hospital, or a skilled nursing facility, or elsewhere.' 42 U.S.C. § 1396d(a).

"Participating States that elect to extend coverage to the 'medically' needy, see n. 1, *supra,* have the option of providing somewhat different categories of medical services to those individuals. 42 U.S.C. § 1396a(a)(13)(C)."

only that such standards be 'reasonable' and 'consistent with the objectives' of the Act. [¶] . . . Although serious statutory questions might be presented if a state medicaid plan excluded necessary medical treatment from its coverage, it is hardly inconsistent with the objectives of the Act for a State to refuse to fund *unnecessary*—though perhaps desirable—medical services." (*Beal* v. *Doe, supra,* 432 U.S. at pp. 444-445 [53 L.Ed.2d at pp. 471-472], fn. omitted.)

Given this background, I turn to an analysis of the two recent cases.

In *Doe* v. *State, Dept. of Public Welfare, supra,* 257 N.W.2d 816, Doe, a transsexual male, had undergone screening and hormonal therapy at a hospital which had a federally funded transsexual surgery program. The funding of this program ended before the surgery was performed on Doe. By the time the program was terminated, Doe had developed all of the physical characteristics of a female short of the surgical procedure. Doe applied to the Hennepin County (Minnesota) Welfare Department to fund the surgery under its medical assistance program. This application was denied. Doe requested and was granted a hearing wherein the hearing officer granted Doe benefits for the surgery. The county appealed the decision to the state welfare department which reversed the hearing officer's decision for the following reasons:

" '1. The DPW Physician's Handbook 205(10) states that the cost of transsexual surgery is not payable under the Medical Assistance Program.

" '2. No conclusive evidence was presented to support the petitioner's contention that, if she has the surgery, her psychological problems will be alleviated to the point that she will no longer be disabled and will become self-supporting.' " (257 N.W.2d at p. 818.)

Doe appealed to the Minnesota trial court, which affirmed the denial of benefits. Doe then appealed to the Minnesota Supreme Court. In a *per curiam* opinion, which cited no cases, the supreme court reversed and remanded the case to the trial court, with instructions to order the state welfare department to grant Doe benefits for the transsexual surgery. The court based its holding on three grounds. None of these three grounds are persuasive here because of factual distinctions between the instant case and *Doe* v. *State, Dept. of Public Welfare.*

The first ground which the court relied upon was that the denial of benefits to Doe violated the Medicaid Act. The court reached this conclusion based on the following regulation: "With respect to the required services for the categorically needy (subparagraph (1) of this paragraph) and the medically needy (subparagraph (2) of this paragraph), the State may not arbitrarily deny or reduce the amount, duration, or scope of, such services to an otherwise eligible individual solely because of the diagnosis, type of illness or condition. Appropriate limits may be placed on services based on such criteria as medical necessity or those contained in utilization or medical review procedures." (45 C.F.R. § 249.10(5)(i).) The court held that this regulation had been violated because it found that the "finding of the hearing officer that the operation was a medical necessity is unchallenged in these proceedings." (*Doe* v. *State, Dept. of Public Welfare, supra,* 257 N.W.2d at p. 821.) The state welfare department's reliance on the handbook provision stating that transsexual surgery was not payable violated the federal regulation's proscription of denying "services . . . solely because of the diagnosis, type of illness or condition"; and the denial could not come within the exception contained in the regulation allowing limitation of services based on medical necessity.[10] As noted above, the Director in the instant case found that the proposed operation was not "reasonable and necessary for the treatment of disease, illness or injury." Thus, the Director's denial did not contravene the federal regulation as did the action of the state welfare department in *Doe.*

The second ground relied upon by the Minnesota Supreme Court was the invalidity of the state welfare department's requirement that an applicant present conclusive evidence that the operation would result in his being taken off the welfare rolls. No such requirement was imposed by respondent herein.

The third ground upon which the court rested its holding was that the decision to deny Doe benefits was arbitrary and unreasonable. This conclusion was based upon the court's finding that the medical necessity of the operation was unchallenged. As stated above, no such finding can

---

[10]In a special concurring opinion, Chief Justice Sheran, joined by Justice Peterson, stated that he agreed with the result reached by the *per curiam* opinion because there was an unchallenged finding that the operation there involved was "medically necessary." The Chief Justice also pointed out, however, that there were important questions which should not be foreclosed by the opinion, such as the extent to which the state can limit the use of public funds for transsexual surgery, and the character of the evidence required to establish medical necessity. (*Doe* v. *State, Dept. of Public Welfare, supra,* 257 N.W.2d at pp. 821-822.)

be made in the instant case. Thus, *Doe* v. *State, Dept. of Public Welfare* is distinguishable on all three grounds relied upon by the Minnesota Supreme Court.

The other recent case cited by appellant is *Rush* v. *Parham, supra,* 440 F.Supp. 383. In *Rush,* the court granted plaintiff's motion for summary judgment and ordered the administrator of the state medical assistance plan to pay for plaintiff's transsexual surgery. The court also declared certain regulations invalid and enjoined the state from applying those regulations in a manner which would irrebuttably deny Medicaid benefits for transsexual surgery. Finally, the court ordered the Secretary of the United States Department of Health, Education and Welfare to disapprove the Georgia plan insofar as the plan irrebuttably denied Medicaid coverage for transsexual surgery.

In *Rush,* plaintiff's treating physicians made the following statements concerning plaintiff's condition: " 'The diagnosis in this case is definitely that of transsexualism. She has made a mature decision in regard to sex reassignment surgery. I feel that such surgery is urgently indicated because of the feelings of despair and frustration which she has had in regard to her condition. There is no approach other than surgery which can alleviate her depression and remove the threat of suicide.' " (440 F.Supp. at p. 386.) The statements of these physicians plus the *Rush* court's interpretation of *Beal* v. *Doe,* and the applicable federal statutes, form the basis for the holding in *Rush.*

The court applied *Beal* v. *Doe* to the problem of transsexual surgery, using the following reasoning. Based on the Supreme Court's statement in *Beal* that "serious statutory questions might be presented if a state medicaid plan excluded necessary medical treatment from its coverage . . . ," the *Rush* court concluded that "Medicaid coverage is not optional or discretionary for necessary medical treatment of eligible recipients." (*Rush, supra,* 440 F.Supp. at p. 389.) With this much of the court's reasoning I agree. But the court continues on to conclude that the administrator of the state plan is bound by the opinion of the treating physician as to the medical necessity of transsexual surgery. I believe that the court reached this conclusion because it failed to read *Beal* and the Medicaid Act in the proper context.

The court in *Rush* states that the " ' "key" role of the physician within the Medicaid assistance [*sic*] . . .' was emphasized in *Beal* v. *Doe, supra,* at 441 n. 3, 442, 97 S.Ct. 2369, 2370." (440 F.Supp. at p. 389.) The court also

relies on the portion of *Beal* where the Supreme Court remanded the case for consideration of whether the Pennsylvania requirement, that two additional physicians concur in the attending physician's determination that his patient's abortion is medically necessary, interferes with the attending physician's medical judgment in a manner not contemplated under the Medicaid Act. (*Rush, supra,* at p. 390.)

In order to properly read the language of the United States Supreme Court concerning the physician's role under the Medicaid Act, it is important to understand the nature of the abortion funding issue as it reached the Supreme Court. An examination of the opinion of the Third Circuit Court of Appeals is helpful in this regard. The Court of Appeals stated the problem this way:

"In both the statute and the regulations of the Department of Health, Education and Welfare, physicians' services are defined by reference to the legal practice of medicine under state law. See § 1396d(a)(5), referring to § 1395x(r)(1); 45 C.F.R. § 249.10(b)(5) (Rev. ed., Oct. 1, 1973). Since *Roe* v. *Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and *Doe* v. *Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), required the states to legalize the practice of elective abortion during the first two trimesters of pregnancy, the plaintiffs argue that elective abortion is now included in the definition of 'physicians' services,' and is therefore required to be furnished to the plaintiffs by § 1396a(a)(13)(B) and (C). Similar arguments are advanced under the rubrics of 'inpatient hospital services,' 'outpatient hospital services,' and 'family planning services.'

"Again, the argument proves too much. Elective cosmetic surgery, for example, is within the licensed practice of medicine in most, if not all, states. If the plaintiffs were correct, the state would be required to pay for such procedures, at the expense, perhaps, of many pressing medical needs of the poor. While § 1903(c) of the original Act may have required the eventual funding of such procedures, its repeal indicates that Congress has no present intention of funding every procedure which falls within the legal practice of medicine. The states are given broad discretion to tailor their programs to their particular needs, and are required to economize and to fund only necessary medical expenses.

"[6] The problem for this court is to harmonize the various competing policies found in the Act and its history. A participating state should be able to adapt its program to its conditions and needs, and to limit the

level of its Medicaid expenditures. This can be accomplished by giving the state broad discretion to define the medical conditions for which treatment is 'necessary' within the meaning of the Act.[11] The proper treatment of such a condition, on the other hand, must be left to the judgment of the attending physician. See *Roe* v. *Norton, supra* at 729." (*Doe* v. *Beal* (3d Cir. 1975) 523 F.2d 611, 620, revd. 432 U.S. 438 [53 L.Ed.2d 464, 97 S.Ct. 2366].)

Particularly noteworthy is the Third Circuit's statement that the state should be given broad discretion in deciding which medical conditions necessitate treatment. Only after the state has decided that medical treatment is necessary, does the professional judgment of the physician become involved to determine which of the alternative medical treatments is medically necessary for the individual patient.

Having come this far, the court states: "Applying the above analysis to the Pennsylvania regulations before us, we find them to be inconsistent with the Act. Since the Commonwealth of Pennsylvania pays for full-term deliveries and also for therapeutic abortions, it is plain that the state has determined, in its discretion, that pregnancy is a condition for which medical treatment is 'necessary' within the meaning of Title XIX." (*Doe* v. *Beal, supra,* 523 F.2d at p. 621.)

Given this background, we see that the Supreme Court in *Beal* had a different starting point than the court in *Rush,* or this court in the instant case. The statement in the dissenting opinion that "[p]regnancy is unquestionably a condition requiring medical services" is obviously correct. (*Beal* v. *Doe, supra,* 432 U.S. at p. 449 [53 L.Ed.2d at p. 475].) A pregnant woman will either have an abortion or carry her child full term to delivery. (See *Beal,* 432 U.S. at pp. 444-445 [53 L.Ed.2d at pp. 471-472].) In the instant case, however, it is not at all clear that it is medically necessary within the meaning of the Medicaid Act for a transsexual to be surgically altered to resemble a person of the opposite sex. Nor is it clear that any other medical, as opposed to psychological, treatment is necessary. The fact that no technique has yet been found which will relieve the depression associated with transsexualism, except transsexual surgery, does not compel the conclusion that such surgery is medically necessary. The court in *Rush* erred in holding that the administrator of the state plan was bound by the attending physician's determination that

---

[11]In a footnote at this point, the court states: "This court is not the first one to relate 'necessary' to the conditions to be treated, rather than to the choice of treatment. See *Roe* v. *Norton, supra* at 729, *Klein* v. *Nassau Cty. Med. Ctr., supra* note 12, at 500."

transsexualism was a condition which necessitated medical treatment, and that transsexual surgery was that medically necessary treatment. I would follow the suggestion of the Third Circuit in *Doe* v. *Beal* and the cases cited therein, and allow "the state broad discretion to define the medical conditions for which treatment is 'necessary' within the meaning of the Act." (523 F.2d at p. 620.)

The other basis for the *Rush* court's holding that the physician's determination of medical necessity should be controlling was drawn from the joint legislative history of the Medicare and Medicaid Acts. The court states:

"The preeminence of the attending physician in the Medicaid program appears in the joint legislative history of the Medicare, 42 U.S.C. § 1395 *et seq.,* and the Medicaid, 42 U.S.C. § 1396 *et seq.,* programs:

" '(1) Physicians' role. The Committee's bill provides that the physician is to be the key figure in determining utilization of health services—and provides that it is a physician who is to decide upon admission to a hospital, order tests, drugs and treatments, and determine the length of stay. S.Rep.No.404, 89th Cong., 1st Sess., 1965 U.S.Code Cong. and Admin.News pp. 1943, 1986.' " (*Rush, supra,* 440 F.Supp. at p. 389.) However, an examination of this legislative history indicates that Congress did not intend to give the attending physician control of the benefits provided by the Medicaid program under the rubric of a determination of medical necessity. Just a few pages subsequent to the above quoted passage from the legislative history, in the same Senate Report, the Finance Committee states: "(b) Exclusions from coverage [¶] The committee's bill would exclude certain health items and services from coverage under both the hospital insurance and the voluntary supplementary medical insurance programs in addition to any excluded through the operation of other provisions of the bill. For example, . . . [e]xpenses for cosmetic surgery would not be covered except where incurred in connection with the prompt repair of an accidental injury or to improve the functioning of a malformed body member. For example, cosmetic surgery could be paid for when furnished in connection with the treatment of a severely burned person." (Sen.Rep. No. 404, 89th Cong., 1st Sess. (1965) 1 U.S. Code Cong. & Admin. News, pp. 1989-1990.) Although this exclusion applies to Medicare and not Medicaid (see 42 U.S.C. § 1395Y), and these are separate programs with different purposes (*Rastetter* v. *Weinberger* (D.Ariz. 1974) 379 F.Supp. 170, 172,

affd. 419 U.S. 1098 [42 L.Ed.2d 795, 95 S.Ct. 767]; see also *American Medical Ass'n.* v. *Mathews* (N.D.Ill. 1977) 429 F.Supp. 1179, 1192; *Dist. of Col. Pod. Soc.* v. *District of Columbia* (D.D.C. 1975) 407 F.Supp. 1259, 1264), this passage illustrates that Congress never intended the role of the physician to circumscribe the scope of statutory exclusions, such as the exclusion of cosmetic surgery from the Medicare Act. But the court in *Rush* states that "[j]udgments of medical necessity must be made for individual patients and what may be cosmetic, experimental, palliative, or unnecessary for some, may be deemed essential for another." (440 F.Supp. at p. 390.) Under the reasoning employed by the court in *Rush,* then, no statutory exclusion can be relied upon to remove certain medical procedures from coverage under a state medical assistance plan. What is cosmetic must be determined in every case. Since all medically necessary operations must be funded, and the determination of medical necessity is relegated to the attending physician, each attending physician defines the parameters of coverage under the state plan for his own patients. This does not seem to be an accurate interpretation of Congressional intent.

In addition, this interpretation of the Medicaid Act presents a problem because of the wide divergence in medical opinion which exists among physicians. This diversity is well exemplified in the battle of the experts which has become the heart of the personal injury case. Without impugning the integrity of the medical profession, I fear that if *Rush* is accepted in California, an applicant who seeks assistance under the Medi-Cal program will be able to shop around until he or she finds a physician who believes such treatment is medically necessary. This fear is backed up by emerging reports that "Medicaid patients have two and one-half times more surgery than the general population" (*Medical Soc. of State of N. Y.* v. *Toia* (2d Cir. 1977) 560 F.2d 535, 537), and other information indicating that some physicians perform unnecessary surgery. (*American Medical Association* v. *Weinberger* (7th Cir. 1975) 522 F.2d 921, 924-925, fn. 5 and accompanying text.)

The solution of the *Rush* court of this problem is woefully inadequate. Stated briefly, the court suggests that the physician's veracity in certifying a medical procedure to be medically necessary can be assured by statutes such as 42 United States Code, section 1396h(a)(1) and (2), providing penalties for the making of false statements. (*Rush, supra,* 440 F.Supp. at p. 390, fn. 12.) While such statutes may help to eliminate fraudulent claims, where the fraud is susceptible of proof, this solution does not

touch the core of the problem—that the administrator of the state medical assistance plan will be bound by the one opinion of the physician chosen by the applicant.[12]

The New York cases concerning transsexual surgery have not held that the state is bound by the opinion of the attending physician as to the medical necessity of the surgery. (*Denise R.* v. *Lavine* (1976) 39 N.Y.2d 279 [383 N.Y.S.2d 568, 347 N.E.2d 893]; *Matter of Vickers* v. *Toia* (N.Y.Sup. Ct., May 1977) C.C.H. Medicaid and Medicare Guide, New Developments, ¶ 28,507.) In *Denise R.,* the court held that the New York state medical assistance plan was not required to pay for transsexual surgery, at least where a conflict existed in the testimony concerning medical necessity. The court reached this result notwithstanding testimony from the treating physician that the surgery was a life or death matter. In *Vickers,* The court held that the determination of the state agency denying Medicaid benefits for transsexual surgery was not arbitrary, unreasonable or capricious. The court noted that evidence offered by the applicant's psychiatrist fell short of the "matter of life or death" testimony offered in *Denise R.,* and that the application in *Denise R.* was denied in the face of such testimony. Had the rationale of *Rush* been accepted, the state would have been forced to accept the treating physician's determination of medical necessity in absence of fraud.

In sum, *Doe* v. *State, Dept. of Public Welfare* is unpersuasive in the instant case, because of the factual differences discussed above. To the extent that *Rush* is not factually distinguishable from the instant case, I would decline to follow it because it incorrectly states the applicable law. I would hold that the Director acted within the limits imposed by the Medicaid Act.

---

[12]The divergence of medical opinion to which I advert is amply demonstrated in the instant case by comparison of the opinions of Dr. Steinman and Dr. Crews, concerning appellant's mental condition. Dr. Crews stated that he was "not particularly impressed by the significance or extent of underlying neurotic or other conflicts." The treatment authorization request filed by Dr. Steinman revealed a different picture of appellant's psychological condition: "Patient is a 25-year-old transvestite who is presently on hormone shots and looking forward to having an operation in Florida as soon as she can convince the surgeon that he is psychologically well enough put together in order to have the sex change operation. Is very tearful and often depressed about inability to live fully as a woman. In addition he has some fixed delusions about extraterrestrial creatures controlling him and controlling the earth. M.S.: Anxious, tearful, pressured, delusions about 'creatures controlling his life and controlling the life of all earth people.' Diagnostic Impression: Trends. Vestiges of a desire to be transsexual, consider paranoid schizophrenia. Treatment Plan: Reality."

III. Constitutional Considerations

A. *Equal Protection*

Appellant argues that transsexuals are treated differently than other similarly situated Medi-Cal recipients, in violation of the equal protection clauses of the United States and the California Constitutions. Although classifications based upon sex have been given an intensified level of scrutiny under some circumstances (*Frontiero* v. *Richardson* (1973) 411 U.S. 677 [36 L.Ed.2d 583, 93 S.Ct. 1764]), this level of scrutiny has not been applied to classifications based on transsexualism. (*Holloway* v. *Arthur Andersen & Co.* (9th Cir. 1977) 566 F.2d 659; *Powell* v. *Read's, Inc.* (D.Md. 1977) 436 F.Supp. 369; see also *Voyles* v. *Ralph K. Davies Medical Center* (N.D.Cal. 1975) 403 F.Supp. 456; *Smith* v. *Liberty Mutual Insurance Company* (N.D.Ga. 1975) 395 F.Supp. 1098.) Thus, the rational relationship test applies. The state has a legitimate interest in using limited funding in the most efficient way. Appellant has presented no evidence that Medi-Cal finances the surgical removal and reconstruction by plastic surgery of organs not diseased, damaged or deformed, under any circumstances. Respondent's refusal to extend Medi-Cal funding to such an operation is a reasonable point at which benefits under the program can be cut off. I would hold that appellant's equal protection argument is without merit.

B. *Conclusive Presumption—the Due Process Clause*

Appellant states that "California has an established policy to deny all transsexual surgery." Appellant claims that this policy violates his due process rights as recognized by *Doe* v. *State, Dept. of Public Welfare, Rush* v. *Parham,* and *Rosas* v. *Montgomery* (1970) 10 Cal.App.3d 77 [88 Cal.Rptr. 907, 43 A.L.R.3d 537]. Neither *Doe* v. *State, Dept. of Public Welfare* nor *Rush* v. *Parham* discussed constitutional claims. Although both cases dealt with the problem of total exclusion of transsexual surgery from a state medical assistance plan, this policy of exclusion was only considered in light of the Medicaid Act. The construction of the Medicaid Act in these two cases, and their relation to the instant case, have been discussed above.

*Rosas* v. *Montgomery* likewise did not deal with a constitutional issue. *Rosas* held that the Director of the State Department of Social Welfare was without discretion under the applicable statutes to promulgate a regulation denying benefits under the Aid to Needy Disabled program to

alcoholics. Since the statutes governing the Director's role in *Rosas* are different from the statutes which define respondent's role in the Medi-Cal program, the court's ruling on the propriety of the regulation promulgated in *Rosas* is irrelevant here.

Appellant cites numerous cases in support of the proposition that a conclusive presumption is constitutionally impermissible. But appellant has not proved that he was denied benefits on the basis of a conclusive presumption. The Medi-Cal Guideline denying benefits for transsexual surgery, discussed above, did not form the basis of respondent's decision. Although Dr. Erdbrink felt compelled to rely on it, the Director did not. Furthermore, respondent has presented evidence that transsexual surgery has been financed in at least one case, where the applicant suffered from an endocrinological disease, hypogonadism, which made his genitals useless. In the instant case, the Director, after examining the evidence presented at the hearing, declined to hold that transsexual surgery was a medically necessary treatment for gender identity dysphoria. Rather than a conclusive presumption that this surgery is never medically necessary, respondent's action was merely an exercise of his discretion to define the terms "reasonable and necessary" as these are used in section 51303, subdivision (a) of the California Administrative Code.

In *Piontkowski* v. *Geduldig* (1974) 39 Cal.App.3d 498, 504-505 [114 Cal.Rptr. 316], an applicant for Medi-Cal benefits appealed from the Director's refusal to authorize the purchase of an orthopedic mattress. One argument urged by appellant on appeal was "that a regulation which specifically excludes orthopedic mattresses from Medi-Cal coverage (Cal. Admin. Code, tit. 22, § 51321(e)(8)) establishes an irrebuttable presumption that such a mattress can never be considered as part of a remedial or preventative program in the promotion of appellant's health and care, and thus violates the due process clause of the Fourteenth Amendment. (*Heiner* v. *Donnan* (1932) 285 U.S. 312, 329 [76 L.Ed. 772, 780, 52 S.Ct. 358].)" The court responded, "There is no such presumption at bench. The regulation simply states that orthopedic mattresses do not fit within the definitions of items available under Medi-Cal. We are not dealing with a presumption. We deal with an exclusion made pursuant to statutory authority in strict accord with settled medical and generally accepted public definitions, consistent in all respects with the declared legislative intent as defined in the Medi-Cal statutes. To include a proper exclusion requires a redefinition or extension of pertinent

language of the act itself. Such an inclusion or redefinition is the function of the Legislature." (*Id.,* at pp. 504-505.)

In the instant case, as in *Piontkowski,* respondent merely gave effect to proper exclusions—the regulations excluding payment for cosmetic surgery and health care services which are not reasonable or necessary for the prevention, diagnosis or treatment of disease, illness or injury. (Cal. Admin. Code, §§ 51303, subd. (a), 51305, subd. (g).) Appellant's due process rights were not violated.

## C. *Right to Privacy*

No case has yet held that the decision to undergo transsexual surgery is part of the right to privacy, protected by the California Constitution (art. I, § 1) or the United States Constitution from state interference. In *Roe* v. *Wade* (1973) 410 U.S. 113, 153 [35 L.Ed.2d 147, 177, 93 S.Ct. 705], the court held that the Texas criminal statute dealing with abortions was such a sweeping restriction on a woman's constitutionally protected choice to terminate pregnancy during the first trimester, that the state must show a compelling state interest to justify the restriction. It is not at all clear that a criminal statute prohibiting transsexual surgery would be constitutionally infirm. Assuming, arguendo, that the choice to undergo the surgery is afforded the same protection as a woman's choice to terminate pregnancy, appellant still could not show that he suffered a constitutional deprivation.

In *Maher* v. *Roe* (1977) 432 U.S. 464, 474 [53 L.Ed.2d 484, 495, 97 S.Ct. 2376, 2383], the court held that Connecticut's regulation denying medical assistance benefits for nontherapeutic abortions did not impinge upon the fundamental right to privacy recognized in *Roe.* Following *Maher* v. *Roe,* I would hold that the Director did not violate appellant's right to choose to undergo transsexual surgery, if such right exists. Appellant's claim that the state has interfered with the physician-patient relationship by disagreeing with appellant's physicians about the necessity of the surgery is without merit. The Director has only rendered an opinion as to the "necessity" of the operation as a payable treatment for disease under the Medi-Cal program. Appellant and his physicians were free to decide, without interference, the advisability of proceeding at their own expense. Apparently, appellant has already exercised this freedom and undergone the surgical operation.

In conclusion, I would hold that the Director acted within his discretion in denying appellant's request to have Medi-Cal pay for his transsexual surgery. No state or federal statute or constitutional provision was offended by the Director's action.

I would affirm the judgment.

A petition for a rehearing was denied May 19, 1978. Scott, J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied June 29, 1978. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.