Jane DOE, Appellant,

v.

STATE of Minnesota, DEPARTMENT OF
PUBLIC WELFARE, Respondent,

Hennepin County Welfare Board,
Respondent.

No. 47131.

Supreme Court of Minnesota.

Aug. 19, 1977.

Michael R. Fargione, Legal Aid Society, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Thomas L. Fabel, Deputy Atty. Gen., Marianne D. Short, Special Asst. Atty. Gen., St. Paul, for State.

Gary Flakne, County Atty., James F. Bares, Asst. County Atty., Minneapolis, for Hennepin County Welfare Bd.

Heard before TODD, MacLAUGHLIN, and YETKA, JJ., and considered and decided by the court en banc.

TODD, Justice.

Jane Doe is an adult male transsexual. After an initial screening process, Doe was selected to undergo sex conversion surgery at one of the University of Minnesota Hospitals (university hospital) in its original transsexual program. The Federal funding of the university hospital's program ended before surgery was performed on Doe. Thereafter, Doe, an eligible recipient of medical assistance (M.A.) benefits, applied to the Hennepin County Welfare Department (county welfare department) to fund the operation under its M.A. program. After an initial denial of his request, a hearing was conducted before a hearings officer for the county welfare department who determined to grant Doe benefits for the surgery. The county welfare department appealed this decision to the Minnesota Department of Public Welfare (state welfare department), which reversed the hearings officer's decision, concluding in part that Doe should not be granted benefits because he failed to prove that the requested surgery would allow him to become self-supporting. Doe appealed to the district court which affirmed the state welfare department's decision to deny benefits. We reverse and remand.

Jane Doe is a female pseudonym for appellant, a 45-year-old genetic male, who is a transsexual. As a transsexual, Doe began cross-dressing as early as 1950. For the past 10 years, Doe has attempted to live his entire life as a female, including changing his name. Since 1968, Doe has been undergoing hormonal therapy at the university hospital. The purpose of hormonal therapy is to assist an individual in developing female characteristics while also preparing him for sex conversion surgery.

Doe was one of 25 candidates selected from a large number of applicants to undergo sex conversion surgery at the university hospital in its original transsexual program. Sex conversion or reassignment is a complicated procedure which involves the removal of the male sex organs and construction of female genitalia to replace the male organs. Stoller, Sex and Gender, p. 247. Prior to his admission into the university hospital's transsexual program, Doe underwent extensive evaluation and testing by the university hospital's gender committee in order to determine the propriety of surgery in his case. Apparently, by the time the program was terminated, Doe had developed all the physical characteristics of a female absent the removal of the male sex organs and the construction of the female sex organs. The surgical procedure was not ultimately performed on Doe because funding for the university hospital's program for transsexuals was ended.

After the termination of the university hospital's program, Doe applied to the county welfare department to fund the surgical procedure under its M.A. program. Since 1972, Doe has been an eligible recipient of benefits under the M.A. program because he was certified as totally disabled for psy-

chological reasons resulting from his transsexual condition.

Doe was informed by his social worker that his application for M.A. benefits had been denied. Thereafter, Doe filed an appeal from the denial of M.A. benefits with the county welfare department. An evidentiary hearing was conducted by a local hearings officer who reversed the original decision of the county welfare department and granted Doe benefits for the surgery.

The county welfare department appealed to the state welfare department which reversed the hearings officer's decision and determined that Doe was ineligible to receive M.A. benefits for the proposed surgical procedure, stating:

"1. The DPW Physician's Handbook 205 (10) states that the cost of transsexual surgery is not payable under the Medical Assistance Program.

"2. No conclusive evidence was presented to support the petitioner's contention that, if she has the surgery, her psychological problems will be alleviated to the point that she will no longer be disabled and will become self-supporting."

Doe then filed an appeal from the state welfare department's decision with the district court pursuant to Minn.St.1974, § 256B.11.[1] After a hearing, the trial court affirmed the state welfare department's decision denying Doe benefits.

The following issues are raised on appeal:

(1) Whether the absolute prohibition against the funding of transsexual surgery through the use of M.A. benefits included in the state welfare department's publication, the Medical Assistance Program Physician's Handbook, is valid.

(2) Whether the standard employed by the state welfare department requiring Doe to prove that the surgical treatment requested would eliminate his disability and render him self-supporting is legally permissible.

(3) Whether the decision of the state welfare department denying Doe M.A. benefits for sex conversion surgery was arbitrary and unreasonable.

Initially, a general discussion concerning transsexualism is in order. A transsexual male is a person anatomically male who psychologically identifies himself as and believes himself to be a woman. In discussing the problem of transsexualism, medical experts have found it useful to distinguish between the terms "sex" and "gender." Sex connotes the anatomical qualities that determine whether one is male or female, while gender relates to behavior, feelings, and thoughts and does not always correlate with one's physiological status. See, generally, Stoller, Sex and Gender.

Although for most members of society sex and gender are synonymous, it is possible for each to develop independently. Ibid. In cases when sex and gender do develop independently, the end product is often a transsexual person plagued by the serious problem of "gender role disorientation, a painful cross-gender identity." Benjamin, *Should Surgery be Performed on Transsexuals*, 25 Am. J. of Psychotherapy 74, 75. See, also, Pauly, *Adult Manifestations of Male Transsexualism*, Transsexualism and Sex Reassignment, p. 37. The problem of gender role disorientation that often produces an adult transsexual occurs very early in life, occasioned primarily from postnatal psychodynamic factors. See, Benjamin, *supra*, p. 75; Stoller, *supra*, p. 83; Green, *Childhood Cross-Gender Identification*, Transsexualism and Sex Reassignment, p. 23.

The adult male transsexual[2] is an anatomical male who has irreversibly accepted

---

1. We note that this appeal procedure was repealed by L.1976, c. 131, § 2. However, since this action was commenced before this law became effective, it is properly before this court.

2. Transsexualism should be distinguished from homosexuality and transvestitism: "The average homosexual is a different person from the true transvestite or the transsexual, because he does not suffer from a gender identity disturbance as do the other two. Homosexuals, men or women, are satisfied with their anatomical status. They accept themselves in their male or female roles in life, even including those particular individuals who represent the effemi-

a gender identification as a female. He considers himself a normal woman trapped inside a male body. The transsexual male consciously views his male genitals as a symbol of maleness which runs directly contrary to his gender identity as a female. Since his male sex organs are a source of immense psychological distress, the male transsexual seeks their removal and construction of female sex organs in order to make both his sexual identity and his gender identity consistent. See, Stoller, *supra*, p. 260; Pauly, *supra*, p. 58.

Given the fact that the roots of transsexualism are generally implanted early in life, the consensus of medical literature is that psychoanalysis is not a successful mode of treatment for the adult transsexual. See, Benjamin, *supra*, p. 78; Stoller, *supra*, p. 249. The only medical procedure known to be successful in treating the problem of transsexualism is the radical sex conversion surgical procedure requested by Doe in the present case:

> "It is the alternative that is sobering. In the light of present knowledge, there is no known approach to treatment of transsexualism other than the surgical route. Nothing else holds promise. Granted that the surgical route is difficult and clearly second-best to a method of preventing these tragic reversals of gender identity and role, yet it seems to be all that there is to offer at present." Hastings, *Postsurgical Adjustment of Male Transsexual Patients*, 1 Clinics in Plastic Surgery 335, 344.

See, also, Benjamin, *supra*, p. 80.

Thus, it is not unreasonable to conclude that transsexualism is a very complex medical and psychological problem which is generally developed by individuals early in life. By the time an individual reaches adulthood, the problem of gender role disorientation and the transsexual condition resulting

therefrom are so severe that the only successful treatment known to medical science is sex conversion surgery.

1. The medical assistance program under which benefits are being sought in the present case is funded through Title XIX of the Social Security Act, 42 U.S.C.A. § 1396. It can be generally described as a venture in what is commonly referred to as "cooperative federalism" in that the state administered program as a condition to receiving Federal funds is required to conform to applicable Federal statutes and regulations. The State of Minnesota in establishing its medical assistance program has provided that the administration of the program is to be consistent with applicable Federal law, Minn.St. 256B.18, and that the various terms and provisions of the state program "are intended to comply with and give effect to the program set out in Title XIX of the federal Social Security Act." Minn.St. 256B.22.

The state welfare department publishes a book entitled the Medical Assistance Program Physician's Handbook to assist local physicians in the administration of the medical assistance program. The provisions included within the handbook are only advisory in nature and do not have the effect of law. However, a provision in the handbook which totally excludes transsexual surgery from coverage under the medical assistance program was employed by the state welfare department to support its denial of benefits to Doe in the present case. An advisory provision when utilized by an administrative agency to justify its determination in a particular case approaches the status of a formal rule of law of the agency. The Medical Assistance Program Physician's Handbook, § 205, excludes the following medical services from M.A. coverage:

> "1. Medications dispensed by the physician when the necessary medications

nate male type, or its female counterpart, the 'butch' type of a lesbian.

"The typical transsexual presents a sharp contrast. He or she, both, reject their anatomical status and their secondary sex characters with greater or lesser vehemence." Benjamin, *Should Surgery be Performed on Transsexuals*, 25 Am. J. of Psychotherapy 74, 75.

A transvestite, by definition, represents a somewhat of a "middle status" and obtains satisfaction by dressing or masquerading in clothing of the opposite sex.

can reasonably be dispensed by a pharmacy. * * *

"2. Medical services or supplies purchased by a recipient himself.

"3. The cost of an autopsy.

"4. Failed appointments.

"5. Telephone calls or other communications between the provider and recipient.

"6. Routine reports (social security, insurance, etc.).

"7. Investigational surgery or procedures (i. e., research efforts that are not *essential* to the patient's health).

"8. Illegal operations.

"9. Artificial insemination.

"10. *Transsexual surgery.*" (Italics supplied in part.)

Examination of the entire provision reveals that transsexual surgery is the only surgical treatment which, if recommended by a physician and related to a patient's health, is not covered by the program. Additionally, the outright prohibition of benefits for transsexual surgery runs afoul of a provision included within 45 CFR, § 249.10 (1976), which imposes the following requirements upon state programs implementing Title XIX of the Social Security Act:

"(5)(i) Specify the amount and/or duration of each item of medical and remedial care and services that will be provided to the categorically needy and to the medically needy, if the plan includes this latter group. Such items must be sufficient in amount, duration and scope to reasonably achieve their purpose. With respect to the required services for the categorically needy (subparagraph (1) of this paragraph) and the medically needy (subparagraph (2) of this paragraph), *the State may not arbitrarily deny or reduce the amount, duration, or scope of, such services to an otherwise eligible individual solely because of the diagnosis, type of illness or condition. Appropriate limits may be placed on services based on such criteria as medical necessity or those contained in utilization or medical review procedures.*" (Italics supplied.)

■ The total exclusion of transsexual surgery from eligibility for M.A. benefits is directly related to the type of treatment involved and, therefore, is in direct contravention of the aforestated regulation. There is no explicit provision appearing in the Federal statutes that would prohibit the payment of medical benefits for inpatient hospital care for transsexual surgery. See, 42 U.S.C.A. § 1396d(a)(1). Therefore, we hold that the total exclusion of transsexual surgery from eligibility for M.A. benefits appearing in the Medical Assistance Program Physician's Handbook and employed by the state welfare department to support its denial of benefits to Doe is void.

■ In future cases involving an application for M.A. benefits to fund transsexual surgery, a thorough, complete, and unbiased medical evaluation should be made by the individual agencies to determine whether the requested surgery is "medically necessary." The medical necessity of each applicant requesting funding of transsexual surgery must be considered individually, on a case-by-case basis. Such a requirement is consistent with applicable Federal statutes concerning the funding of Title XIX. See, 42 U.S.C.A. § 1396. We regard this as a practical, equitable solution to the rather unique and complicated problem posed by transsexualism. The determination of medical necessity through a thorough medical evaluation of the individual applicant will ensure that those individuals genuinely requiring sex conversion surgery will be able to obtain it but will deny benefits to persons not demonstrating such medical necessity.

2. In denying Doe M.A. benefits for sex conversion surgery, the state welfare department not only relied upon the total prohibition against funding transsexual surgery appearing in the Medical Assistance Program Physician's Handbook but also enunciated its own standard of medical necessity. A close reading of the second conclusion appearing in the state welfare department's decision indicates that in order to qualify for M.A. benefits Doe would have to prove that the surgery would eliminate

his disability and render him self-supporting. This standard appears to be unusually difficult for any surgical patient to meet.

▪ The use of this standard by the state welfare department is improper for two reasons. First, the standard appears to equate medical necessity with a guarantee of surgical success. Medical science has not attained the level of precision necessary to assure each prospective surgical patient that a particular operation will definitely cure a given disability. Certainly a cancer patient should not be required to prove by conclusive evidence, in order to qualify for M.A. benefits, that removal of a cancerous tumor will eradicate the disease. To require an applicant for M.A. benefits to prove by conclusive evidence that a particular operation will eliminate a disability would be, in many cases, an impossible task and would deprive many needy persons of helpful medical treatment.

Second, the standard adopted by the state welfare department associates the requirement of medical necessity with the removal of an applicant's name from the welfare rolls. We believe that such a requirement is improper and impermissible. A standard that demands a particular applicant for M.A. benefits to prove by conclusive evidence that the medical treatment requested will render him self-supporting, if applied in every case, would be ludicrous. The self-support requirement would deny to many terminally ill patients the medical treatment required to relieve their discomfort and pain. We view this as an undesirable, inequitable possibility of which we strongly disapprove. Thus, we hold that the standard enunciated by the state welfare department requiring an applicant to prove by conclusive evidence that the requested medical treatment will eliminate a given disability and render him self-supporting is invalid and should not be used in future cases.

3. Finally, we must address the denial of M.A. benefits in the case at hand. By agreement between the parties, the state welfare department based its decision upon the findings of the county welfare department's hearings officer and the arguments of counsel. Since there was no transcript made of the proceedings before the county hearings officer, we must rest our decision upon his findings. The hearings officer, after considering the evidence produced by Doe to demonstrate his need for the surgical procedure, determined that the operation was a medical necessity.

▪ On appeal, the state welfare department overruled his determination, basing its decision to deny Doe benefits upon the two conclusions of law which we discussed earlier and found to be improper and invalid. At oral argument before this court, the state welfare department conceded that it did not request new evidence in the proceeding before it to contradict the testimony and evidence produced by Doe to demonstrate that the operation was medically necessary. The finding of the hearings officer that the operation was a medical necessity is unchallenged in these proceedings. Given this fact, and after due consideration of the record, we conclude that the state welfare department's decision denying Doe M.A. benefits was arbitrary and unreasonable and was based upon rules and standards which we hold to be void and impermissible.

This case is remanded to the district court with instructions to order the state welfare department to grant Doe M.A. benefits to fund the surgical procedure.

Reversed and remanded.

SHERAN, Chief Justice (concurring specially).

I agree with the result in this case because there is an unchallenged finding that the operation here involved was "medically necessary." The extent to which the use of public funds for transsexual surgery can be limited by the State of Minnesota and the character of the evidence required to establish medical necessity are matters not before us in this case. There are important questions which should not be considered foreclosed by this opinion. See, *Beal v. Doe,* —— U.S. ——, 97 S.Ct. 2366, 53

L.Ed.2d 464 (1977); *Rush v. Parham,* filed August 2, 1977, U.S.D.C., Northern District of Georgia, Atlanta Division, Civil Action C76–1445A.

PETERSON, Justice (concurring specially).

I join in the opinion of the Chief Justice.