Paula HARE, Respondent,

v.

STATE of Minnesota, DEPARTMENT OF HUMAN SERVICES, Appellant.

Hennepin County Welfare Board, Respondent,

UCare Minnesota, Respondent.

No. C9–03–33.

Court of Appeals of Minnesota.

July 29, 2003.

Mike Hatch, Attorney General, Patricia Sonnenberg, Assistant Attorney General, St. Paul, MN, for Appellant.

Philip A. Duran, Minneapolis, MN, and Constance Hope, Maple Grove, MN, for Respondent Paula Hare.

Amy Klobuchar, Hennepin County Attorney, Arthur W. Katzman, Assistant County Attorney, Minneapolis, MN, for Respondent Hennepin County Welfare Board.

Lora Esch Mitchell, Fredrikson & Byron, P.A., Minneapolis, MN, for Respondent UCare Minnesota.

Considered and decided by LANSING, Presiding Judge, PETERSON, Judge, and WRIGHT, Judge.

## OPINION

WRIGHT, Judge.

After respondent Paula Hare was denied coverage for gender reassignment surgery by UCare Minnesota (UCare), her health plan, she appealed to the health plan's contracting agency, the Minnesota Department of Human Services (DHS), which affirmed UCare's decision. Hare sought judicial review in district court, and the district court reversed DHS's order. DHS now appeals, arguing that the district

court erred when it ruled that (1) Minn. Stat. § 256B.0625, subd. 3a (2002), the provision addressing coverage for gender reassignment, is unconstitutionally vague and (2) DHS failed to follow rulemaking procedures when it adopted a definition for "gender reassignment services" in Minn. Stat. § 256B.0625, subd. 3a. Because we conclude that Hare's treatments for gender dysphoria and for chemical dependency required to begin hormone therapy are "gender reassignment services" under Minn.Stat. § 256B.0625, subd. 3a, we affirm.

## FACTS

Since she was a small child, respondent Paula Hare, although born male, has had the desire to be female. In mid–1997, Hare consulted with Dr. Sharon Satterfield, a gender-identity-disorder specialist, seeking treatment for gender dysphoria.[1] Dr. Satterfield concluded that, because Hare suffered from a substance-abuse problem, hormone drug therapy and gender reassignment surgery, both necessary for the physical transformation from male to female, were not appropriate unless Hare was free of chemicals for one year. Following her initial consultation with Dr. Satterfield, Hare successfully completed chemical-dependency treatment and participated in group and individual therapy for gender dysphoria. Under Dr. Satterfield's care, Hare began hormone therapy in September 1998.

Hare is a member of the MinnesotaCare health program and received services from UCare, a health plan that provides services to MinnesotaCare participants under contract with DHS. In December 1998, Hare began treatment for gender dysphoria with Dr. William Robiner of the Fairview University Medical Center. On August 21, 2000, Dr. Robiner requested authorization from UCare for Hare to undergo gender reassignment surgery.

MinnesotaCare will pay for gender reassignment surgery only if a person began receiving "gender reassignment services" prior to July 1, 1998. Minn.Stat. § 256B.0625, subd. 3a (2002). UCare denied Hare's request for coverage for gender reassignment surgery based on its determination that Hare, having begun hormone therapy in September 1998, had not commenced "gender reassignment services" before July 1, 1998. Hare appealed this decision to DHS, and an administrative referee affirmed UCare's decision. Hare then sought judicial review. Before the district court, Hare argued that Minn.Stat. § 256B.0625, subd. 3a, (1) was misinterpreted by DHS; (2) violates her constitutional right to privacy and bodily integrity; and (3) violates her equal protection rights. The district court requested additional briefing on whether Minn.Stat. § 256B.0625, subd. 3a, is void for vagueness and whether DHS properly adopted the definition of "gender reassignment services." Because there is no statutory definition of "gender reassignment services," the district court ruled that Minn.Stat. § 256B.0625, subd. 3a, is unconstitutionally void for vagueness. The district court also concluded

1. "Gender dysphoria" is a "psychological state whereby a person demonstrates dissatisfaction with their sex of birth and the sex role, as socially defined, which applies to that sex, and who requests hormonal and surgical sex reassignment." The Harry Benjamin Standards of Care for Gender Dysphoric Persons (1990). The Benjamin Standards, which UCare uses when it reviews a request for coverage of gender reassignment surgery, "are protocols used by qualified professionals in the United States to treat individuals suffering from gender identity disorders." *Kosilek v. Maloney*, 221 F.Supp.2d 156, 158 (D.Mass. 2002).

that, because DHS failed to adopt a definition of "gender reassignment services" by rule, its application to Hare is void. DHS now appeals.

## ISSUE

Did the district court err in determining that MinnesotaCare is obligated to pay for gender reassignment surgery where, before July 1, 1998, the patient received services that included only treatment for gender dysphoria and chemical-dependency treatment that was required to begin hormone therapy?

## ANALYSIS

### I.

■ The initial question before the district court was one of statutory interpretation, which we review de novo. *Schons v. State Farm Mut. Auto. Ins. Co.*, 621 N.W.2d 743, 745 (Minn.2001). In interpreting Minn.Stat. § 256B.0625, subd. 3a, we must "ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2002). Thus, we examine the language of Minn.Stat. § 256B.0625, subd. 3a, to determine how it applies to Hare. The language of the statute contemplates a cutoff date after which an individual may no longer secure insurance coverage for gender reassignment. "Gender reassignment surgery and other gender reassignment medical procedures including drug therapy for gender reassignment are not covered unless the individual began receiving *gender reassignment services* prior to July 1, 1998." Minn.Stat. § 256B.0625, subd. 3a (emphasis added). The phrase "gender reassignment services" is crucial in determining whether a person may secure coverage for gender reassignment. If an individual began receiving "gender reassignment services" prior to July 1, 1998, he or she is entitled to coverage.

But a person who began receiving these services after July 1, 1998, is not.

Hare sought gender-dysphoria treatment from Dr. Satterfield, a gender-identity-disorder specialist, in mid–1997. Almost immediately after Dr. Satterfield's first interview with her, Hare began the chemical-dependency treatment. In a letter to UCare, Dr. Satterfield stated that such treatment was required to begin hormone therapy. During this time, Hare also participated in group and individual therapy for gender dysphoria.

Because DHS does not dispute that prior to July 1, 1998, Hare sought gender-dysphoria treatment with Dr. Satterfield and participated in chemical-dependency treatment in preparation for hormone therapy, we must determine whether these activities constitute "gender reassignment services" for purposes of Minn.Stat. § 256B.0625, subd. 3a. The phrase "gender reassignment services" is not expressly defined by Minn.Stat. § 256B.0625, subd. 3a. In 1995, however, DHS issued a policy clarification stating that "gender reassignment services include hormone therapy and sex reassignment surgery."

■ When we interpret a statute, we must first decide whether the statutory language, on its face, is ambiguous. *Am. Tower, L.P. v. City of Grant*, 636 N.W.2d 309, 312 (Minn.2001). If the legislative intent "is clearly discernable from plain and unambiguous language, statutory construction is neither necessary nor permitted and courts apply the statute's plain meaning." *Id.* (citation omitted). DHS asserts that "gender reassignment services" refers only to hormone therapy and surgery; Hare argues that the phrase is unconstitutionally vague. The definition urged by DHS is not explicitly stated in the words of the statute. Minn.Stat. § 256B.0625, subd. 3a, contains no explicit language that defines the limits of "gender

reassignment services." "We retain the authority to review de novo errors of law which arise when an agency decision is based upon the meaning of words in a statute." *In re Eller Media*, 664 N.W.2d 1, 7 (Minn.2003) (citation omitted).

■ We begin by examining the individual words constituting the disputed phrase. The Minnesota Supreme Court has defined the term "gender" in the context of a similar case. *See Doe v. State, Dept. of Pub. Welfare*, 257 N.W.2d 816, 818 (Minn. 1977). In that case, Jane Doe appealed from a denial of medical-assistance benefits to pay for "sex conversion surgery." *Id.* at 817. In defining both terms, the supreme court distinguished "sex" from "gender": "Sex connotes the anatomical qualities that determine whether one is male or female, while *gender relates to behavior, feelings, and thoughts and does not always correlate with one's physiological status." Id.* at 818 (emphasis added). "Courts presume that the legislature acts with full knowledge of previous statutes and existing caselaw." *Pecinovsky v. AMCO Ins. Co.*, 613 N.W.2d 804, 809 (Minn.App.2000), *review denied* (Minn. Sept. 26, 2000); *cf.* Minn.Stat. § 645.17(4) (2002) (stating that "[w]hen a court of last resort has construed the language of a law, the legislature in subsequent laws on the same subject matter intends the same construction to be placed upon such language"); *W. Union Tel. Co. v. Spaeth*, 232 Minn. 128, 132, 44 N.W.2d 440, 442 (1950) (stating that "reenactment of a statute without change, after construction * * * by the court, presumptively constitutes an adoption of such construction"); *State v. Newman*, 538 N.W.2d 476, 478 (Minn.App. 1995) (stating that "after the supreme court ruled that a BB gun could be a firearm under the aggravated robbery and mandatory minimum sentence statutes, the legislature has reenacted the criminal stat-

utes without giving 'firearm' another definition and, thus, has presumptively adopted the supreme court's definition"), *review denied* (Minn. Nov. 30, 1995).

DHS asserts that "gender reassignment services" are only those services that "cause physical transformation of the body"—hormone therapy and surgery. In light of the supreme court's determination that gender "does not always correlate with one's physiological status," *Doe*, 257 N.W.2d at 818, the limited definition of "gender reassignment services" that DHS advocates is unavailing. We must assume that, in drafting legislation addressing nearly identical subject matter as that in *Doe*, the legislature chose the word "gender" with full knowledge of its prior judicial interpretation.

■ "Reassign" means "[t]o assign a new position, distribution or function[.]" *American Heritage Dictionary* 1506 (3d ed.1992). The parties do not dispute the definition of this word. DHS urges us to conclude that the word "services" means "deeds instrumental toward attaining some object." It maintains that the disputed phrase must mean acts instrumental to changing a person's sex. In addition to the above-discussed distinction between gender and sex, we conclude that the plain meaning of "services" is not so narrow. "Services" means "[w]ork done for others as an occupation or a business[.]" *Id.* at 1649. Applying the plain language of the statute, we do not conclude that DHS's preferred definition of "gender reassignment services" reflects the legislature's intent as it applies to Hare. We conclude that "gender reassignment services" means work done, most likely by a medical professional, for a person seeking, at a minimum, treatment to address the behavior, feelings, and thoughts of the biological sex different than his or her own.

As defined above, the plain meaning of these words demonstrates that "gender reassignment services" reasonably includes the treatment for gender dysphoria and chemical dependency that Hare underwent prior to July 1998. *Doe's* interpretation of "gender" permits treatment necessary to address gender dysphoria, even if the treatment itself does not directly result in physical transformation, to be a "gender reassignment service." Thus, we conclude that the plain meaning of the disputed phrase includes treatments for gender dysphoria and for chemical dependency required to begin hormone therapy.

DHS urges us to conclude that, because "gender reassignment services" are "technical words," they must be construed according to their special meaning. *See* Minn.Stat. § 645.08 (stating that such terms should be "construed according to such special meanings or their definition"). As a source for the term's technical meaning, DHS cites the Benjamin Standards, maintaining that their use of the term "reassignment" only refers to hormone therapy and surgery. DHS further contends that the University of Minnesota lists only hormone therapy and sex reassignment surgery when it defines the term "sex reassignment services." Our review of the Benjamin Standards shows otherwise. While the Benjamin Standards expressly define "hormonal sex reassignment" and "surgical sex reassignment," they do not define "gender reassignment services," "gender reassignment," or even "sex reassignment." Accordingly, the Benjamin Standards do nothing to assign a special meaning for purposes of the instant case and do not guide us in determining legislative intent.

The phrase "gender reassignment" is used four times in Minn.Stat. § 256B.0625, subd. 3a: (1) "gender reassignment surgery," (2) "gender reassignment medical procedures," (3) "drug therapy for gender reassignment," and (4) "gender reassignment services." In ascertaining legislative intent, we presume that "the legislature intends the entire statute to be effective." Minn.Stat. § 645.17(2) (2002); *see also Amaral v. St. Cloud Hosp.*, 598 N.W.2d 379, 384 (Minn.1999) (stating that "no word, phrase, or sentence should be deemed superfluous, void, or insignificant"). Within the single sentence comprising section 256B.0625, subdivision 3a, the legislature employed these four phrases using similar modifying words. To give meaning to the entire statute and thus avoid rendering any phrase superfluous, each of the four phrases employed by the legislature must have a distinct and separate meaning. Thus, "gender reassignment services" must have a definition that is distinct from gender reassignment surgery and drug or hormone therapy for gender reassignment. If the legislature intended "gender reassignment services" to be limited to surgery and hormone therapy, it would have chosen language that explicitly demonstrates this intention. We decline to go beyond our role as interpreters of the language employed by the legislature and infer legislative intent from evidence that simply is not present.

We conclude that the term "gender reassignment services" is not ambiguous as it applies to Hare. When the statute's words are given their plain meaning, it is clear that the legislature intended the phrase "gender reassignment services" to comprise more than just surgery and hormone therapy. Successful completion of chemical-dependency treatment was an integral part of Hare's treatment for gender dysphoria and a necessary first step in the process of obtaining the physically transformative procedures of hormone therapy and gender reassignment surgery. Because the language of the statute does not place a discernable exclusion on the types

of services Hare received, we conclude that seeking treatment for gender dysphoria and completing the requisite chemical-dependency treatment are encompassed by the statutory language. Hare commenced these gender reassignment services prior to July 1, 1998. She, therefore, meets the statutory coverage requirements for gender reassignment surgery.

DHS argues that the district court erred when it ruled that Minn.Stat. § 256B.0625, subd. 3a (2002), is unconstitutionally vague as applied to Hare. Although the district court based its decision on an analysis of the constitutionality of the statute in question, we first determine if there is an alternative ground upon which we may resolve the dispute between the parties. *See State v. Hoyt,* 304 N.W.2d 884, 888 (Minn.1981) (stating that "[w]e do not decide constitutional questions except when necessary to do so in order to dispose of the case at bar"); *Minn. Baptist Convention v. Pillsbury Acad.,* 246 Minn. 46, 62, 74 N.W.2d 286, 296 (1955) (stating that "[u]nder well-settled rules the court refrains from deciding, where it is unnecessary to do so, constitutional and other legal questions"); *State v. One Oldsmobile Two–Door Sedan, Model 1946,* 227 Minn. 280, 288, 35 N.W.2d 525, 530 (1948) (stating that "[c]ourts will not decide questions relating to the constitutionality of statutes unless it is absolutely necessary to do so"). In light of our

ruling that Minn.Stat. § 256B.0625, subd. 3a, is not ambiguous as applied to Hare, we need not reach the district court's application of the constitutional vagueness doctrine[2] to this case. *See Hoyt,* 304 N.W.2d at 888 (stating that constitutional questions are decided only if necessary to dispose of case).

Hare argues that the definition for "gender reassignment services" adopted by DHS in its 1995 policy clarification failed to adhere to rulemaking requirements. A rule is "every agency statement of general applicability and future effect." Minn. Stat. § 14.02, subd. 4 (2002). An agency must promulgate as rules all formal and informal procedures "to the extent that those procedures directly affect the rights of or procedures available to the public." Minn.Stat. § 14.06(a) (2002). The 1995 policy clarification stated that "gender reassignment services include hormone therapy and sex reassignment surgery." Our review of this language establishes that the policy clarification provides no greater definition of "gender reassignment services" than the statute itself. By using the term "include," the policy clarification, like the statute, does not exclude Hare's pre-July 1998 treatment for gender dysphoria and chemical-dependency treatment. In the absence of any limiting language, the policy merely *includes* hormone

---

**2.** *See St. Cloud Newspapers, Inc. v. Dist. 742 Cmty. Schs.,* 332 N.W.2d 1, 7 (Minn.1983) (stating that "[a] statute is impermissibly vague when 'men of common intelligence must necessarily guess at its meaning' " (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 607, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973))); *Humenansky v. Minn. Bd. of Med. Exam'rs.,* 525 N.W.2d 559, 564 (Minn.App. 1994) (stating that a phrase is unconstitutionally vague only when its meaning "is neither commonly understood nor established by judicial construction" (citing Minn.Stat. § 645.08(1) (1992))), *review denied* (Minn. Feb. 14, 1995); *but see Nyeholt v. Secretary of* *Veterans Affairs,* 298 F.3d 1350, 1357 (Fed. Cir.2002) (stating that where statute defining eligibility for veterans medical benefits "[did] not purport to define what is lawful and unlawful conduct," veteran's petition "fail[ed] to present a constitutional challenge that is cognizable under the void-for-vagueness doctrine"); *Woodruff v. United States,* 954 F.2d 634, 642 (11th Cir.1992) (stating that challenge to provision in procedural manual determining injured employee's eligibility for compensation under Federal Employees' Compensation Act was meritless because the provision was mere interpretive rule and did not attempt to guide conduct).

therapy and sex reassignment surgery in the definition of "gender reassignment services;" but the definition is not *limited* to these components. Because we do not rely on the policy clarification for our analysis of the statute's plain language, we need not reach the issue of whether proper rulemaking procedures were followed.

### DECISION

The phrase "gender reassignment services" in Minn.Stat. § 256B.0625, subd. 3a (2002), includes treatment for gender dysphoria and chemical-dependency treatment that must be completed in order to receive hormone therapy and gender reassignment surgery. Because Hare began "gender reassignment services" prior to July 1, 1998, she meets the statutory coverage requirements for gender reassignment surgery.

**Affirmed.**