Holmes, J., concurring: On this record, for this taxpayer, and on the facts found by the Judge who heard this case, I agree with the majority’s conclusion — that O’Donnabhain can deduct the cost of her hormone therapy and sex-reassignment surgery, but not her breast-augmentation surgery. I also agree with the majority that GID is a mental disorder, and therefore a disease under section 213. But I disagree with the majority’s extensive analysis concluding that sex reassignment is the proper treatment — indeed, medically necessary at least in “severe” cases — for GID. It is not essential to the holding and drafts our Court into culture wars in which tax lawyers have heretofore claimed noncombatant status. I. A. What does it mean for a person born male to testify, as did O’Donnabhain, that “I was a female. The only way for me to — the only way for me to be the real person that I was in my mind was to have this surgery”? This is not like saying “Lab tests show Vibrio cholerae, and therefore I have cholera”, or “the X-ray shows a tumor in the lung and therefore I have lung cancer”, or even “the patient reports that he is Napoleon and is being chased by the English”, and therefore has schizophrenia. In the crash course on transsexualism that this case has forced on us, there are at least four approaches that those who’ve studied the phenomenon of such feelings have had. One response, curtly dismissed by the majority, is that this is a form of delusion: It is not obvious how this patient’s feeling that he is a woman trapped in a man’s body differs from the feeling of a patient with anorexia nervosa that she is obese despite her emaciated, cachectic state. We don’t do liposuction on anorexics. Why amputate the genitals of these poor men? Surely, the fault is in the mind and not the member. McHugh, “Psychiatric Misadventures”, Am. Scholar 497, 503 (1992). For such psychiatrists, gender follows sex, is a fundamental part of human nature, and is not easily amenable to change. Those who take this view look at transsexual persons to uncover what they suspect are comorbidities — other things wrong with their patients that might explain the undoubtedly powerful feeling that they are wrongly sexed and whose treatment might alleviate the stress that it causes them. A second approach focuses on the notion of “feeling female.” What does this mean? The answer adopted by the majority and urged by O’Donnabhain is that this is a shorthand way of saying that a transsexual person’s gender (i.e., characteristic way of feeling or behaving, and conventionally labeled either masculine or feminine) is strongly perceived by her as mismatched to her sex (i.e., biological characteristics).[1] This, too, is highly contested territory — gender being thought by many, particularly feminists, to be entirely something society imposes on individuals. To such theorists, transsexualism is likewise a social construct: The medical profession need not direct the gender dissatisfied to surgery. Counselling is possible to encourage clients to take a more political approach to their situation and to realize that they can rebel against the constraints of a prescribed gender role, and relate to their own sex in their native bodies. Jeffreys, “Transgender Activism: A Lesbian Feminist Perspective,” 1 J. Lesbian Stud. 55, 70 (1997) (suggesting SRS be proscribed as “crime against humanity”); see also id. at 56 (citing Raymond, The Transsexual Empire (Teachers College Press 1994)). Yet a third school of thought is that the origins of at least many (but not all) transsexual feelings — particularly those with extensive histories of secret transvestism — is that it’s not about gender, but about a particular kind of erotic attachment. See, e.g., Blanchard, “Typology of Male-to-Female Transsexualism,” 14 Archives Sexual Behav. 247 (1985); Cohen-Kettenis & Gooren, “Transsexualism: A Review of Etiology, Diagnosis and Treatment,” 46 J. Psychosomatic Res. 315, 321 — 22 (1999) (summarizing research); Lawrence, “Clinical and Theoretical Parallels Between Desire for Limb Amputation and Gender Identity Disorder,” 35 Archives Sexual Behav. 263 (2006). Scholars of this school regard SRS as justified — not so much to cure a disease, but because SRS relieves suffering from an intense, innate, fixed, but otherwise unobtainable desire. See, e.g., Dreger, “The Controversy Surrounding The Man Who Would Be Queen: A Case History of the Politics of Science, Identity, and Sex in the Internet Age,” 37 Archives Sexual Behav. 366, 383-84 (2008). These are all intensely contested viewpoints. The fourth and currently predominant view among those professionally involved in the field is the one urged by O’Donnabhain, and not effectively contested by the Commissioner: that the reason a transsexual person seeks SRS is to correct a particular type of birth defect — a mismatch between the person’s body and her gender identity. That mismatch has a name — GID— if not yet any clinically verifiable origin, and SRS (plus hormone therapy) is simply the correct treatment of the disorder. I profess no expertise in weighing the merits of biodeter-minism, feminism, or any of the competing theories on this question. But the majority’s decision to devote significant analysis to the importance of characterizing GID as a disease, and SRS as its medically necessary treatment, pulls me into such matters to give context to the majority’s analysis. B. The majority relies heavily on the Benjamin standards to establish the proper diagnosis and treatment of GID. I certainly agree that these standards express the consensus of WPATH — the organization that wrote them and has seen six revisions of them over the last 30 years. But the consensus of WPATH is not necessarily the consensus of the entire medical community. The membership of WPATH is limited, consisting of professionals that work with transsexual patients, including social workers, psychiatrists, and surgeons that perform SRS. The Commissioner’s expert, Dr. Schmidt, testified that the Benjamin standards are merely guidelines rather than true standards of care and that they enjoy only limited acceptance in American medicine generally. The majority cites several psychiatric textbooks that mention the Benjamin standards to refute Dr. Schmidt’s claim and as evidence of their general acceptance in the psychiatric profession. Majority op. note 45. But the textbooks treat the Benjamin standards as mere guidelines — which may or may not be followed — rather than clearly endorsing SRS. Let’s take a closer look at the excerpted language from each of the majority’s sources: • “[The Benjamin standards] [provide] a valuable guide? • “[T]he patient may be considered for surgical reassignment;” • “The [Benjamin standards of care] programme includes • * * possibly sex reassignment * * * patients * * * can be referred for surgery;” • “[S]ex reassignment may be the best solution;” and • After noting that the treatment of gender identity disorders is “not as well-based on scientific evidence as some psychiatric disorders,” the cited text states that “[l]iving in the aspired-to gender role * * * enables one of three decisions: to abandon the quest, to simply live in this new role, or to proceed with breast or genital surgery.” See majority op. note 45 (all emphasis added and citations omitted). The textbooks do not say that SRS “should” or “must” be used as treatment for GID, but only that it “may” or “can” be used. The members of WPATH certainly follow the Benjamin standards, but since they are merely a “guide” and “not as well-based on scientific evidence” as other psychiatric treatments, their general acceptance is questionable. The American Psychiatric Association’s practice guidelines — generally accepted standards of care — make no mention of the Benjamin standards.[2] Even the Benjamin standards themselves contain the following caveat in the introduction: All readers should be aware of the limitations of knowledge in this area and of the hope that some of the clinical uncertainties will be resolved in the future through scientific investigation. The Harry Benjamin International Gender Dysphoria Association’s Standards of Care for Gender Identity Disorders, Sixth Version 1 (2001). WPATH is also quite candid that it is an advocate for transsexual persons, and not just interested in studying or treating them. Its website includes a downloadable statement that can be sent to insurers or government agencies denying reimbursement or payment for surgery to those diagnosed with GID. WPATH, “WPATH Clarification on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A.,” (June 17, 2008), available at http:// www.tgender.net/taw/WPATHMedNecofSRS.pdf (last visited Jan. 7, 2010). But it also comprehensively addresses other problems it feels should be solved. For example, Genital reconstruction is not required for social gender recognition, and such surgery should not be a prerequisite for document or record changes * * *. Changes to documentation are important aids to social functioning, and are a necessary component of the pre-surgical process * * *. Id. at 2. Claims of medical necessity as they affect public-record rules at least suggest the possibility that wpath is medicalizing its advocacy. And even WPATH’s method of identifying candidates for SRS — the method we describe and effectively endorse today— is very much contestable. A leading article (admittedly ten years old at this point, but still oft cited), concluded on this topic that “[u]nfortunately, studies evaluating the indispensability of components of the currently employed procedures are nonexistent.” Cohen-Kettenis & Gooren, supra at 325. II. The majority reasons that O’Donnabhain’s hormone therapy and SRS treat a disease, and so their costs are deductible expenses of medical care. It then adds a coda to the opinion holding that these treatments are “medically necessary.” Majority op. p. 76. A. The best way of framing the question of deductibility is to view the medical-expense provisions in the Code as creating a series of rules and exceptions. Section 262(a) creates a general rule that personal expenses are not deductible. Section 213(a) and (d)(1) then creates an exception to the general rule for the expenses of medical care if they exceed a particular percentage of adjusted gross income. Section 213(d)(9) then creates an exception to the exception for cosmetic surgery. And section 213(d)(9)(A) then creates a third-order exception restoring deductibility for certain types of cosmetic surgery. To show how this works in practice, consider reconstructive breast surgery after a mastectomy. This is a personal expense (i.e., not incurred for profit, in a trade or business, etc.). But such surgery affects a “structure of the body” under section 213(d)(1) and so is “medical care.” But it’s presumptively “cosmetic surgery” under section 213(d)(9)(B) because, as reconstructive surgery, it is “directed at improving the patient’s appearance and does not meaningfully promote the proper function of the body or prevent or treat illness or disease.” It is nevertheless deductible cosmetic surgery under section 213(d)(9)(A) because it is “necessary to ameliorate a deformity arising from, or directly related to, a * * * disfiguring disease.” I agree with the majority’s holding that O’Donnabhain’s GID is a disease. Until the collapse of psychiatry into the waiting arms of neurology is complete, courts must of necessity rely on the listing and classification of disorders in the DSM.[3] But once this point is made, we need not go further into a discussion of the proper standards of care or opine on their effectiveness. Our precedent, as the majority correctly points out, allows for the deductibility of treatments that are highly unlikely to survive rigorous scientific review. See, e.g., Dickie v. Commissioner, T.C. Memo. 1999-138 (naturopathic cancer treatments); Tso v. Commissioner, T.C. Memo. 1980-399 (Navajo sings as cancer treatment); see also Rev. Rul. 55-261, 1955-1 C.B. 307, 307 (services of Christian Science practitioners) (subsequent modifications irrelevant). The key question under section 213(d)(1) is whether the treatment is therapeutic to the individual involved. See Fischer v. Commissioner, 50 T.C. 164, 174 (1968). This is essentially a test looking to the good-faith, subjective motivation of the taxpayer. There is no doubt that O’Donnabhain meets it with regard to her hormone therapy and SRS. B. 1. It is the majority’s next step in the analysis — its reading of the definition of cosmetic surgery in section 213(d)(9)(B)— that I cannot join. If it had reasoned simply that to “treat” illness in section 213(d)(9)(B) meant the same low standard that it does in section 213(d)(1) — a subjective good-faith therapeutic intent on the part of the patient — and stopped, we wouldn’t be doing anything controversial. In the absence of any regulation, there would be no reason to demur, because as the majority carefully points out, the phrase “medical necessity” is nowhere in the Code. Majority op. p. 74. Nor of course is medical necessity consistent with the liberal construction of section 213 both by us and by the IRS. (The deductibility of Navajo sings and Christian Science prayer did not depend on their medical necessity.) The phrase occurs in only one place, in what is not even the most relevant legislative history. Majority op. note 54. That should have been enough to dispense with the Commissioner’s argument on this point. But the majority tacks on an extra section onto its opinion concluding that SRS and hormone therapy for transsexual persons are “medically necessary.” Avoidance would have been the sounder course, because “medically necessary” is a loaded phrase. Construing it puts us squarely, and unnecessarily, in the middle of a serious fight within the relevant scientific community, and the larger battle among those who are deeply concerned with the proper response to transsexual persons’ desires for extensive and expensive surgeries. As the majority thoroughly explains, the theory that SRS is the best — and perhaps the only — treatment for GID has been extensively promoted. Dr. Brown, O’Donnabhain’s expert witness, summed up the theory — SRS is medically necessary to “cure or mitigate the distress and maladaption caused by GID.” Majority op. p. 43. For governments or insurers to exclude coverage thus becomes perceived as discrimination or an unjust deference to stereotypes of transsexual persons. Acceptance of SRS as medically necessary has become a cause not only for those with GID, but for a wider coalition as well. See Jeffreys, supra. Our discussion of the science is, though, weak even by the low standards expected of lawyers. Tucked into a footnote is our opinion on the relative merits of the scientific conclusions of Dr. Brown (O’Donnabhain’s witness in favor of the medical necessity of SRS) and Dr. Schmidt (the Commissioner’s witness who was opposed). Majority op. note 56. The reasoning in that footnote in favor of Dr. Brown’s opinion is that he is more widely published than Dr. Schmidt. But Dr. Schmidt was chair of the Sexual Disorders Work Group that drafted part of the DSM-rv on which the majority relies, and is a longtime psychiatry professor at Johns Hopkins and a founder of its Sexual Behavior Consultation Unit. (I think it fair to take judicial notice that Johns Hopkins is a well-regarded medical institution.) The majority also criticizes Dr. Schmidt for citing a religious publication. See majority op. note 47. It’s true that one of the sources Dr. Schmidt cited was an article by the former chairman of Johns Hopkins’ Psychiatry Department in First Things. But it is inadequate, if we’re going to weigh in on this debate, to imply that Johns Hopkins’ conclusion was based merely on an essay in “a religious publication.” First Things, like Commentary and a host of other general-interest but serious periodicals, seeks out the small subset of specialists who can write well.[4] Essays by such people don’t aspire to be original research, but they are often based on original research. And so was the First Things article by Dr. McHugh, which summarized the research of a third member of the Hopkins Psychiatry Department, Dr. Jon Meyer. Meyer & Refer, “Sex Reassignment,” 36 Archives Gen. Psychiatry 1010 (1979). In the study, Dr. Meyer followed up with former Johns Hopkins Gender Identity Clinic patients. Unlike authors of previous studies, Meyer included both unoperated GID patients and post-SRS patients in his study— allowing him to compare the well-being of the operated and unoperated patients. Using patient interviews, he issued initial and followup adjustment scores for both the operated and unoperated patients. Both the operated and unoperated subjects’ mean scores improved after the followup period, but there was no significant difference between the improvement of each group. The operated group failed to demonstrate clear objective superiority over the unoperated group — in other words, SRS didn’t provide any objective improvement to the GID patients. There are numerous other clues that the picture of scientific consensus that the majority presents is not quite right. Consider where the surgeries are currently performed. SRS was for many years primarily undertaken in research hospitals that had “gender identity clinics.”[5] These clinics would conduct research on SRS and evaluate its effectiveness. Johns Hopkins, under the leadership of Dr. John Money,[6] opened the first U.S. gender identity clinic in 1965. Money & Schwartz, “Public Opinion and Social Issues in Transsexualism: A Case Study in Medical Sociology,” in Transsexualism and Sex Reassignment 253 (Green & Money eds., 1969). After Johns Hopkins took the lead, other university-based clinics jumped at the opportunity to research transsexualism and perform SRS.[7] But the first research clinic to perform and study SRS was also the first to cut it off. The Meyer study had found no significant difference in adjustment between those who had SRS and those who didn’t, and in light of that study Johns Hopkins announced in 1979 that it would no longer perform SRS. “No Surgery for Transsexuals,” Newsweek, Aug. 27, 1979, at 72. After the Hopkins clinic closed, the other university-based clinics either closed or ended their university affiliations. Denny, supra. Stanford, for example, in 1980 spun off its university-affiliated clinic to a private center that performed SRS but didn’t conduct research. Levy, “Two Transsexuals Reflect on University’s Pioneering Gender Dysphoria Program,” Stanford Rep., May 3, 2000. Eventually, all university-based research clinics stopped the practice of SRS.[8] Id. Today, SRS in the United States is primarily the purview of a few boutique surgery practices. While such surgeons — including O’Donnabhain’s — are undoubtedly skilled in their art, they do not have the capacity to conduct research on the medical necessity of SRS like the research hospitals. Their practices use the Benjamin standards, but do not seem to conduct peer-reviewed studies of their efficacy. It is true that the Meyer piece has been the subject of lively controversy,[9] but it is certainly the case that it prompted Hopkins to get out of the SRS business; and over the next few years every other teaching hospital also left the field. Denny, supra. If we needed to opine on the medical necessity of SRS, some sensitivity to that academic controversy, particularly the problem of how to set up a proxy control group for those undergoing sex reassignment, as well as some sensitivity to defining and measuring the effectiveness of surgery, would have to be shown. I do not believe we should have addressed the issue.[10] 2. There is, however, a related cluster of problems that judges and lawyers have had to solve — questions of the medical necessity of SRS in: • Eighth Amendment prisoner cases; • ERISA litigation; and • Medicaid and Medicare reimbursement. The majority correctly cites the decisions of seven circuit courts that have concluded GID constitutes a “serious medical need” for purposes of the Eighth Amendment. Majority op. p. 62. While confirming that GID is a “profound psychiatric disorder,” see, e.g., Maggert v. Hanks, 131 F.3d 670, 671 (7th Cir. 1997), no circuit court has in this area held that SRS— or even the less-invasive hormone therapy — is a “medically necessary” treatment for GID. At least one has even emphasized that there is no right to “any particular type of treatment, such as estrogen therapy.” Meriwether v. Faulkner, 821 F.2d 408, 413 (7th Cir. 1987) (citing Supre v. Ricketts, 792 F.2d 958 (10th Cir. 1986), in which the court refused to hold that a prison’s decision not to provide a self-injuring prisoner with estrogen violated the Eighth Amendment as long as some form of treatment for GID was provided); Lamb v. Maschner, 633 F. Supp. 351 (D. Kan. 1986) (finding prison officials were not constitutionally required to provide prisoner with specific treatment requested of hormones and SRS). Judge Posner’s summary of the GlD-prisoner cases is instructive: Does it follow that prisons have a duty to administer (if the prisoner requests it) * * * [SRS] to a prisoner who unlike Maggert is diagnosed as a genuine transsexual? The cases do not answer “yes,” but they make the question easier than it really is by saying that the choice of treatment is up to the prison. The implication is that less drastic (and, not incidentally, less costly) treatments are available for this condition. * * * Maggert, 131 F.3d at 671 (citations omitted). The medical necessity of SRS shows up in ERISA litigation as well. See, e.g., Mario v. P & C Food Mkts., Inc., 313 F.3d 758 (2d Cir. 2002). Mario, a female-to-male transsexual, sued for reimbursement of the cost of his sex-reassignment surgery from his employer’s ERISA-governed health insurance plan. The plan administrator denied his claim for lack of medical necessity based on an investigation that included the following: [Research on the issue of transsexualism, inquiry into the policies of other employers and insurance carriers concerning coverage of gender reassignment procedures, consultation with medical centers having specialized knowledge of transsexualism and sexual reassignment surgeries, and consultation with medical personnel employed by [the plan administrator], including a psychiatrist retained by [the plan administrator], Dr. Ivan Fras. Dr. Fras opined that the surgical removal of healthy organs, for no purpose other than gender dysphoria, would fall into the category of cosmetic surgery, and would therefore not be “medically necessary.” On the basis of her investigation, * * * [the plan administrator employee] concluded that there was substantial disagreement in the medical community about whether gender dysphoria was a legitimate illness and uncertainty as to the efficacy of reassignment surgery. * * * Id. at 765-66. The plan administrator’s SRS-lacks-medical-necessity conclusion survived de novo review by the Second Circuit. Medicare’s administrator — The Centers for Medicare and Medicaid Services — has weighed in on the issue by denying reimbursement for SRS on the following basis:[11] Because of the lack of well controlled, long term studies of the safety and effectiveness of the surgical procedures and attendant therapies for transsexualism, the treatment is considered experimental. Moreover, there is a high rate of serious complications of these surgical procedures. For these reasons, transsexual surgery is not covered. 54 Fed. Reg. 34572 (Aug. 21, 1989). The legal issues presented in each of these clusters of cases differ from the legal question — are O’Donnabhain’s procedures deductible under section 213? — that we face in this case, but I think they illustrate the majority’s overreach in finding SRS “medically necessary.” III. I do not think that highlighting what I think is the incorrect interpretation of the Code by the majority is enough. O’Donnobhain carefully argued in the alternative, and it is to those alternative arguments that I now turn. A. I start back at the beginning with section 213(d)(1)(A), which defines “medical care” to include not just amounts paid for the “diagnosis, cure, mitigation, treatment, or prevention or disease,” but also amounts paid “for the purpose of affecting any structure or function of the body.” The Commissioner actually stipulated that all three procedures O’Donnabhain received that are at issue here — hormone treatment, SRS, and breast augmentation — meet this alternate definition of “medical care.”[12] This should have obviated the need to wade into the disputes about classification, etiology, and diagnosis of O’Donnabhain’s GID. The majority does cite one sentence from the applicable regulation for the proposition that medical care is confined to expenses “‘incurred primarily for the prevention or alleviation of a physical or mental defect or illness.’” Majority op. p. 65 (quoting section 1.213 — l(e)(l)(ii), Income Tax Regs.). But that sentence doesn’t apply to the second type of medical care — lest it be somehow read to overturn even the IRS’s settled opinion that procedures as diverse as abortion, Rev. Rui. 73-201, 1973-1 C.B. 140, vasectomies, id., and face lifts, Rev. Rul. 76-332, 1976-2 C.B. 81, qualify as “medical care” because they affect a structure or function of the body. (That’s what the first sentence of section 1.213-1(e)(1)(h), Income Tax Regs., says.[13]) There is therefore little doubt that the expenses O’Donnabhain incurred qualify as medical care under section 213(d)(1)(A). But are they nondeductible “cosmetic surgery?” B. Under section 213(d)(9)(B), it is a necessary condition for characterization as “cosmetic surgery” that a procedure be “directed at improving the patient’s appearance.” O’Donnabhain urges us to find that her procedures were directed at resolving or reducing the psychological distress at feeling herself trapped in a body of the wrong sex. The Commissioner says that may be true, but the procedures involved obviously changed her appearance. There is no regulation helping us to apply this language; we need to use the traditional judicial tools to do so. This first requires us to parse the meaning of “directed at” and “improving”. “Directed at” as a phrase is nowhere else in the Code and is not a specialized legal or tax term, but it has a common meaning of “focused at,” or “concentrating on.” “Improving” is likewise a word in ordinary use, meaning “to enhance,” or “make more desirable.” Webster’s Third New International Dictionary (1961). The legislative history of the provision, which the majority quotes, lists some of the procedures that Congress aimed at including in the presumptively nondeductihle category: under the provision, procedures such as hair removal electrolysis, hair transplants, lyposuction [sic], and facelift operations generally are not deductible. In contrast, expenses for procedures that are medically necessary to promote the proper function of the body and only incidentally affect the patient’s appearance or expenses for the treatment of a disfiguring condition arising from a congenital abnormality, personal injury or trauma, or disease (such as reconstructive surgery following removal of a malignancy) continue to be deductible * * *. Majority op. note 27. The list isn’t in the Code itself, so it’s not quite right to hold we must apply the maxim of ejusdem generis, but it is helpful in suggesting the meaning of the key words that did make it into law. Without more specific guidance from the Secretary in the form of a regulation, I would conclude that “directed at improving” reflects two concepts. The first is that the subjective motivation of the patient (his “focus”) is important, and it is his primary motivation that is most important. The second is that the notion of “improving” suggests a baseline from which something is improved — all the procedures in the committee’s list are those commonly recognized by the average observer in our society as improving appearance in a way that a biological man’s taking female hormones and undergoing extensive genital surgery do not. (I also concur with the majority that the breast surgery did not “treat disease.”) I therefore end up in the same place as the majority. O’Donnabhain’s hormone treatment and SRS established a biological baseline of a new sexual appearance for her. It was, of course, foreseeable, and she intended, to change her appearance. But I also agree with her (as the majority does) that her purpose was to relieve the pathological anxiety or distress at being biologically male (or, alternatively, at not feeling masculine). Majority op. note 52. Hormones and SRS are, I would hold as a general matter in such cases, directed at treating GID in this sense and do not so much improve appearance as create a new one. But the breast-augmentation surgery is different. O’Donnabhain’s new baseline having been established through hormones, I would hold that that surgery was directed at improving — in the sense of focused on changing what she already had — her already radically altered appearance. Denying the deduction for this procedure while allowing it for the hormones and SRS also seems a reasonable distinction — breast surgery is likely one of the commonest types of cosmetic surgery and (if not undergone after cancer surgery or trauma or the like) highly likely to be within the common public meaning of that phrase. That leaves only the question of whether O’Donnabhain’s breast-augmentation surgery meets one of the exceptions to the nondeductibility of cosmetic surgery listed in subsection (d)(9)(A). This is easy — O’Donnabhain never argued her breasts were deformed by “a congenital abnormality, a personal injury resulting from an accident or trauma, or disfiguring disease.” I therefore respectfully concur with majority’s result, if not its reasoning. Goeke, J., agrees with this concurring opinion. For a longer discussion on the definitions of gender versus sex, see Meyer, “The Theory of Gender Identity Disorders,” 30 J. Am. Psychoanalytic Assn. 381, 382 (1982) (“Although the term ‘gender’ is sometimes used as a synonym for biological ‘sex,’ the two should be distinguished. Sex refers to the biology of maleness or femaleness, such as a 46,XY karyotype, testes, or a penis. Gender or gender identity is a psychological construct which refers to a basic sense of maleness or femaleness or a conviction that one is male or female. While gender is ordinarily consonant with biology, and so may appear to be a function of it, gender may be remarkably free from biological constraint. The sense that T am a female’ in transsexualism, for example, may contrast starkly with a male habitus.”) See APA, Practice Guidelines, http://www.psych.org/MainMenuyPsychiatricPractice/ PracticeGuidelines_l.aspx (last visited Jan. 7, 2010). The fluidity of changes in the DSM from edition to edition suggests that the nosology of mental disorders is far from being as precise as, for example, the nosology of diseases caused by bacteria or vitamin deficiencies. I’m therefore somewhat sympathetic to, if ultimately unpersuaded by (because of the great weight of precedent), the Commissioner’s effort to change our interpretation of “disease” in section 213 to mean only maladies with a demonstrated organic cause. I must, however, note the Commissioner’s alternative argument that “negative myths and ignorance that permeate social thinking in the United States regarding transgendered persons” and the “many laws and legal situations [that] are highly discriminatory for persons with GID” mean that the “suffering experienced by GID patients is primarily inflicted by an intolerant society.” Resp. Br. at 172-73. (At least compared to the “elevated status” of the Berdache in some Native American cultures, the Kathoey in Thailand, the Indian Hijra, and the Fa’afafine in the South Pacific, as the Commissioner anthropologically concludes. Id. at 175.) It is not effective advocacy to denigrate the people whose government one is representing. It is not quite accurate to label First Things, any more than Commentary, a “religious publication” given the breadth of the subject matter and lack of sectarian slant in what it publishes. Dr. Schmidt could’ve just as easily cited the same conclusion by the same author in an essay in The American Scholar. McHugh, “Psychiatric Misadventures,” Am. Scholar 497 (1992). {The American Scholar is “untainted” by any connection with religion.) For an overview of the gender clinics, see Denny, “The University-Affiliated Gender Clinics, and How They Failed to Meet the Needs of Transsexual People,” Transgender Tapestry #098, Summer 2002, available at http://www.ifge.org/Article59.phtml (last visited Jan. 7, 2010). Dr. Money was extremely influential in gender identity studies. See Witte, “John Money; Helped Create Studies on Gender Identity,” Associated Press, July 10, 2006, available at http://www.boston.com/news/globe/obituaries/articles/2006/07/10/ john_money_helped_create_studies_on_gender_identity/ (last visited Jan. 7, 2010). But there is now a consensus that some of his most noteworthy work was unethical, and in some respects fraudulent. See Colapinto, “The True Story of John/Joan,” Rolling Stone, Dec. 11, 1997, at 54; Kipnis & Diamond, “Pediatric Ethics and the Surgical Assignment of Sex,” 9 J. Clinical Ethics 398 (Winter 1998). The University of Minnesota, UCLA, Vanderbilt, UVA, Stanford, and Duke were among the more prominent university-based gender identity clinics conducting research. Denny, supra note 5. Some research hospitals, Stanford among them, will perform SRS on a referral basis — but the clinical research on SRS at these hospitals has been shut down. Levy, “Two Transsexuals Reflect on University’s Pioneering Gender Dysphoria Program,” Stanford Rep., May 3, 2000. There has been at least one study that reached a different conclusion using a somewhat similar methodology. See Mate-Kole et ah, “A Controlled Study of Psychological and Social Change After Surgical Gender Reassignment in Selected Male Transsexuals,” 157 Brit. J. Psychiatr. 261 (1990). There have also been numerous studies without controls (or the sort of quasi-controls that Meyer used) that report transsexual persons generally satisfied with the results of SRS. Such studies are as problematic as would be drug studies without double-blind control groups. The question is further complicated by the possibility that different types of transsexuals, see Blanchard, “Typology of Male-to-Female Transsexualism,” 14 Archives Sexual Behav. 247 (1985), will experience different outcomes; as might female-to-male transsexuals compared to male-to-female transsexuals. See generally Cohen-Kettenis & Gooren, supra at 326-28. My point is not to pick Meyer over Mate-Kole, but only to suggest the problem is much more complicated than the majority lets on. It is certainly beyond the competence of tax judges. The feelings on both sides may cause the controversy to slip out of science altogether and land in the politics of the APA as it prepares the next edition of the DSM. See Carey, “Psychiatry’s Struggle to Revise the Book of Human Troubles,” N.Y. Times, Dec. 18, 2008, at A1 (describing petition campaigns to affect membership of drafting group, and disputes among transgendered persons about whether GID should even be classified as a disorder). Some cases hold that states cannot categorically exclude sex-change operations from Medicaid coverage. Pinneke v. Preisser, 623 F.2d 546, 549-550 (8th Cir. 1980); J.D. v. Lackner, 145 Cal. Rptr. 570 (Ct. App. 1978); G.B. v. Lackner, 145 Cal. Rptr. 555 (Ct. App. 1978); Doe v. Minn. Dept. of Pub. Welfare, 257 N.W.2d 816 (Minn. 1977). Over time, these decisions have been overtaken by regulation or statute. See, e.g., Smith v. Rasmussen, 249 F.3d 755, 760-61 (8th Cir. 2001) (upholding regulation overturning Pinneke as reasonable). Until recently, Minnesota was the only state in which Medicaid paid for SRS. Price, “Minnesota Using Medicaid Funding to Pay for Sex-Change Operations,” Wash. Times, Feb. 4, 1996, at A4. But four years ago, it joined the rest of the states. Minn. Stat. Ann. sec. 256B.0625 subd. 3a (West 2007). Here’s what the Commissioner stipulated: “Petitioner’s sex reassignment surgery affected structures or functions of petitioner’s body;” “Petitioner’s prescription hormone therapy affected structures or functions of petitioner’s body;” and “Petitioner’s breast augmentation surgery affected structures or functions of petitioner’s body.” The sentence quoted by the majority is, in context, aimed at distinguishing expenses aimed directly, rather then remotely, at preventing or alleviating illness. It is immediately followed by a list of expenses that are per $e medical-care expenses, and which includes surgery and prescription drugs (like hormones) that O’Donnabhain received.